TRUSTEES OF the NATIONAL ELEVATOR INDUSTRY PENSION, Health Benefit and Educational Funds, Plaintiff,

v.

Andrew **LUTYK**, Defendant.

No. CIV. A. 00–2301.

United States District Court, E.D. Pennsylvania.

May 4, 2001.

Robert Patrick Curley, O'Donoghue and O'Donoghue, David D. Capuano, O'Donoghue & O'Donoghue, Philadelphia, PA, for Trustees of the National Elevator Industry Pension, Health Benefit and Educational Funds, Plaintiffs.

Louis Rosner, Law Offices of Louis Rosner, Philadelphia, PA, for Andrew Lutyk, Defendants.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KATZ, Senior District Judge.

This issue in this case is whether Andrew Lutyk, the sole director and shareholder of American Elevator Company, is personally liable for the corporation's unpaid contributions to employee benefits funds established under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* As set forth in the court's memorandum and order of April 13, 2001 addressing the parties' cross mo-

tions for summary judgment, in order for plaintiff to recover, it must prove one of two things: either 1) that under the terms of the parties' agreements, the unpaid contributions in this case are "plan assets" as that term is employed by ERISA; or, 2) that the circumstances of this case justify piercing of the corporate veil so as to impose liability for corporate obligations on the defendant personally.

The court held a nonjury trial on May 3, 2001 and, as set forth in detail below, rules: 1) that under the terms of the parties' agreements, the unpaid contributions in this case are not "plan assets"; and, 2) that the circumstances of this case justify piercing of the corporate veil. The defendant is therefore personally liable.

## I. *FINDINGS OF FACT*

### A. *General Background*

1. At issue in this case are three jointly trusteed labor-management trust funds created and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). The three funds are the National Elevator Industry Pension Fund, the National Elevator Industry Health Benefit Fund (formerly known as the Welfare Fund) and the National Elevator Industry Educational Fund (collectively, the "NEI Funds"). The Pension Fund is an employee pension benefit plan as defined in Section 3(2) of ERISA, 29 U.S.C. § 1002(2). The Health Fund and Educational Fund are employee welfare benefits plans as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1). All NEI Funds are also multiemployer plans as defined in Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A).

2. The Boards of Trustees of the NEI Funds, the plaintiff in this case, administer the NEI Funds and are fiduciaries of the NEI Funds within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

3. Defendant Andrew Lutyk incorporated American Elevator Company ("American") in late 1992 and has at all times been its president, one of its three officers, its sole director, and its sole shareholder.

4. At all relevant times, American's two other officers were Lutyk's daughter, Julie Gibbs, Treasurer, and an attorney and friend of Lutyk's, Patrick Donnelly, Secretary.

5. Aside from those hired through the union for elevator work, American had several office employees, including Gibbs, who served as office manager, as well as Lutyk's wife Martha, who worked for one or two years in the later years of the company's existence.

6. At all material times, American was an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. § 1002(5), and was engaged in commerce in an industry or activity affecting commerce within the meaning of Sections 3(11) and (12) of ERISA, 29 U.S.C. §§ 1002(11) and (12).

7. Each of the NEI Funds were created pursuant to separate agreements and declarations of trust (collectively known as the "Trust Documents"). The Trust Documents were executed and maintained pursuant to collective bargaining agreements between the International Union of Elevator Constructors, AFL–CIO ("Union") and contractors and contractor associations in the elevator industry.

8. The Standard Agreement is a collective bargaining agreement between various signatory employers and the Union. The first Standard Agreement was effective from July 9, 1992 to July 8, 1997, and the second was effective from July 9, 1997 to July 8, 2002.

9. American is bound by the terms of the Standard Agreement and the Trust Documents by virtue of its two successive

contracts with the Union, the first entered into on April 27, 1993 and the second entered into on August 18, 1997.

10. Under the Standard Agreement and the Trust Documents, an employer is obligated to make monthly contributions to each of the NEI Funds. The employer's monthly contribution to each Fund is calculated by determining the total number of hours worked, including overtime, by each of the employer's covered employees in that particular month, and multiplying these total hours by the hourly contribution rates for each NEI Fund. The relevant hourly contribution rates are set forth in the Standard Agreement. In addition, with respect to the Health Benefit Fund only, an employer is obligated to deduct a certain amount from the paycheck of each covered employee for each hour worked; such employee wage deductions are considered to be "employee contributions" or employee "co-pays" to the Health Benefit Fund.

11. The Standard Agreement and the Trust Documents also obligate an employer to calculate the amount of employer payments and employee wage deductions due to the NEI Funds, and to prepare and forward a single combined monthly remittance report to the NEI Funds. The employer is furthermore required to remit its employer payments and employee wage deductions to the NEI Funds by the fifteenth day of the month following the month in which responsibility for such contributions was incurred.

### B. *Amounts Owed to the NEI Funds*

1. The Boards of Trustees sued American in a separate 1998 suit in this district for contributions that at that time were owed to but had not been remitted to the NEI Funds, as well as for associated liquidated damages, interest, costs, and attorneys' fees.

2. That action, Civil Action No. 98–6544, culminated in a consent judgment dated June 15, 1999 whereby American agreed to pay the NEI Funds a total of $280,284.60, representing unremitted contributions in the amount of $214,453.66 (including both delinquent employer payments and employee deductions that had been withheld from paychecks but never remitted); liquidated damages of $42,890.73; interest of $21,924.21; attorney's fees of $772.50; and costs of $243.50.

3. American remitted to the NEI Funds $40,000.00 pursuant to the consent judgment prior to the filing of the instant action on May 4, 2000. It then remitted to the NEI Funds an additional sum of $2,524.74 on December 13, 2000, which represented all of the withheld employee wage deductions due under the consent judgment. These two sums represent the total amount of money paid by American pursuant to the consent judgment.

4. On May 4, 2000, the plaintiff initiated the instant suit against defendant Lutyk personally, seeking to recover from him individually the full amount that it has been unable to collect from American, as well as additional contributions accrued by American after the time of the consent judgment but never remitted. However, as set forth in the court's memorandum and order of April 13, 2001, claims as to amounts accrued prior to May 4, 1997 are time-barred.

5. Plaintiff in this action thus seeks $287,627.43 from Lutyk personally, as well as attorneys' fees and costs. The sum of $287,627.43 represents: $212,959.79 in unremitted employer payments from the period between May 1997 and November 1999, which includes those accrued both prior to and after the consent judgment; $50,388.12 in associated liquidated damages; and $23,946.98 in associated interest. This sum also represents $332.54 in liqui-

dated damages and interest associated with the $2,524.74 in employee wage deductions paid pursuant to the terms of the consent judgment, which the parties agree was remitted after the commencement of this action. Thus, although the plaintiff seeks no employee wage deductions in this action, it does seek interest and damages on the employee wage deductions that were paid late.

6. Plaintiff seeks liquidated damages of 20% of unpaid contributions under the terms of the Trust Documents, which accords with Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), which requires liquidated damages to be awarded at the rate provided for under the benefits plan in an amount not in excess of 20% of the unpaid contributions.

7. Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), also entitles a benefits plan to interest on unpaid contributions "at the rate provided under the plan, or, if none, the rate prescribed under Section 6621 of Title 26." The interest rate for unpaid contributions in the Trust Documents is the rate used by the Internal Revenue Service at the time of the delinquencies, which is the rate prescribed under Section 6621 of Title 26.

8. There is no dispute among the parties that if Lutyk were to be found liable in this action, he would be liable for the full amount of the unpaid employer payments, liquidated damages and interest sought by plaintiff, with the minor exception of $332.54. The defendant disputes the assessment of $332.54 in liquidated damages and interest associated with the $2,524.74 that was paid on December 13, 2000 and that represents employee wage deductions due under the consent judgment. Lutyk argues that because these wage deductions were covered under the terms of the consent judgment, liquidated damages and interest should not be assessed on them.

## C. Treatment of Unremitted Contributions Under the Parties' Agreements

1. All of the Trust Documents contain very similar language affording protection to the "Trust Fund." The Pension Trust Document states that "[n]either [the National Elevator Industry, Inc., or NEII], the Union, Employers, Employees or their beneficiaries shall have any right, title or interest in or to the Trust Fund or any part thereof other than vesting under the Plan." Pens. Trust Doc. at Art. VI Par. 1. The Health Trust Document includes the same language, except it substitutes "except as required by law" for "other than vesting under the Plan." Heal. Trust Doc. at Art. VI Par. 1. The Education Trust Document similarly states that "[n]o right, title or interest in, any of the monies or property of the Trust Fund shall be invested in NEII, the Union, Employer or Employees, except as required by law." Ed. Trust Doc. at Art. VI Par. 1.

2. In each of the Trust Documents, the definition of "Trust Fund" is "the total of *contributions made* " by employers and/or employees, Trust Docs. at Art. I Par. 8 (emphasis added). This language appears to include only contributions made, and to exclude contributions owed but not yet remitted.

3. In contrast, however, other language strongly indicates that contributions that are owed to the benefit plans are part of the Trust Fund. Each of the Trust Documents provides that "[t]he Trust Fund shall consist of [ ] such sums of money *as shall be paid to* " the NEI Fund by the employers and/or employees "*as contributions required by* the Standard Agreement." Trust Docs. at Art. II Par. 2 (emphasis added) (Ed. Trust Doc. adds "and payments" after "contributions"). Furthermore, each of the Trust Documents states that "[a]ll contributions *shall be made effective* as of the 15th day of each

month for the preceding month." Trust Docs. at Art. VI Par. 4 (emphasis added).

4. The Trust Documents were executed pursuant to collective bargaining agreements between the Union and contractors or subcontractors in the elevator industry.

D. *Facts Relevant to the Piercing of the Corporate Veil*

1. As admitted by Lutyk, starting in 1996 American experienced difficulty in meeting its financial obligations, including its benefit contributions. The company's financial woes were due to the costs of an unrelated lawsuit and misconduct by a prior controller of the company. By late 1999, American was financially unable to continue its operations. During this period from 1996 to 1999, American failed to remit certain contributions to the NEI Funds.

2. Plaintiff's expert Daniel A. Winters, a certified public accountant, also testified as to the insolvency of American during these years. While complete financial records are not available due to their loss in a flood, American's 1997 tax returns and balance sheets show liabilities greater than assets by $342,393.99. American's 1998 tax returns show liabilities greater than assets by $255,729.00.

3. Capital stock in American remained constant at $25,000.00 from at least 1995 to 1998. The defendant claimed at trial that the company was also capitalized with an additional $141,000.00 reported on corporate tax returns for 1995 through 1999 either as "paid-in or capital surplus" or as "additional paid-in capital," but no evidence was presented to support or explain the significance of these line items to whether the company was fully capitalized.

4. In comparison to the $25,000.00 in capital stock, loans from Lutyk to American were significant during all the years for which financial records were produced. At the beginning of 1995, shareholder loans were reported at $95,768.00; at the end of 1995, they had risen to $133,268.00; in 1996, they grew again to $174,881.00, and remained at that level until at least into 1997 or 1998. Thus, American carried a large debt to Lutyk during most of its existence.

5. The company's financial situation declined starting in 1996 until it ceased operations in late 1999. However, corporate tax returns show that while loans had grown to $174,881.00 by the end of 1996, by the end of 1998 they had been reduced to $24,356.00. Lutyk did not dispute the amount of loans, but denied that he received any loan repayments other than perhaps minimal repayments, and attributed the reduction in loans reported on the tax returns to a mistake by his accountant. As he explained it, the loans were not in fact repaid in 1998, but instead the full amount of the loans was simply reclassified as "accounts payable," resulting in the apparent reduction in the amount of shareholder loans reported. However, this explanation is untenable, as tax records show a balance remaining in shareholder loans, which would not have existed had the full amount of the loans been reclassified as claimed. Thus, the court credits neither Lutyk's denial of repayment nor the balance sheets of December 1997 and December 1998 showing $174,881.84 still outstanding in "long term notes," which he offered as supporting documentation. The court notes that yet another and perhaps even more inexplicable explanation for the reported reductions in loans was given by an accountant, Wade Ritchie, who was originally scheduled to testify for the defendant, but whose interpretation of the tax returns were rejected by the defendant at trial.

6. Lutyk further claimed at trial that he was consistently borrowing money himself from friends and other individuals in order to maintain the company as a going

concern. While he claimed that documentation supporting such efforts on behalf of the company from the flooded storage facility existed, none was presented at trial. In addition, he claimed that as part of his personal borrowing for the sake of the company, he took out a second mortgage on his residence; however, this mortgage was not taken out until well after the company ceased operations.

7. Also during the years of the company's financial crisis, Lutyk claimed that he did not draw a salary. However, during those years Lutyk withdrew increasing amounts of cash from the corporation through numerous withdrawals, irregularly scheduled and in even dollar amounts, that were designated on the general ledgers as "partner's drawings" or simply "drawings." In 1997, he withdrew a total of $28,100.00. In 1998, he withdrew a total of $35,913.00. In 1999, he withdrew a total of $38,688.00 in the first three months of the year alone. At trial, Lutyk explained that these withdrawals were for "expenses," justified on the grounds that he had put money into the company, and was therefore entitled to withdraw money "to live" upon as well.

8. Lutyk also testified at trial that his daughter earned only five dollars an hour as office manager for the first five to six years, but payroll records show that for some period prior to December 1998 she earned $15.00 an hour and then earned almost $20.00 an hour after that time, having received a raise during a time of deepening financial crisis. Lutyk also hired his wife around this time at $15.00 per hour, although she had no work experience, unlike his daughter.

9. Also during those years, Lutyk used corporate funds to pay travel and entertainment expenses for himself and his daughter, totaling approximately $5,000.00 in the first ten months of 1997 and over $4,300.00 in 1998, as reported in the general ledger. The vast majority of these entries are without description or identified business purpose. The travel and entertainment expenses included yacht and golf club fees totaling over $2,600.00 in 1996 and almost $1,000.00 in 1998, although Lutyk admitted that he brought corporate clients to the clubs only a few times per year and that prior to American's incorporation he had been a personal member of these clubs for many years.

10. In addition, Lutyk reported the contributions owed but never remitted to the NEI Funds as losses to American, which were passed through to his personal income tax returned as beneficial tax deductions. In 1997, this deduction was $75,572.00; in 1996, it was $50,738.00.

11. The only formal corporate records still in existence are the Articles of Incorporation, the corporate by-laws, and the minutes of the organizational meeting. Lutyk testified that most of American's corporate records no longer exist due to a flood at the facility where they were stored after American ceased operations in late 1999. No independent verification of the loss due to the flood was offered to support or rebut this testimony. The court notes, however, that at trial Lutyk first claimed that records salvaged from the flood supported his personal loans taken out on behalf of the company, but later, when asked whether files pertaining to the benefits funds had been saved, denied having any knowledge of which records had been salvaged.

12. In addition, CPA Winters testified that when his company performed an audit of American in 1996, certain corporate and shareholder records were not available and that many financial reports were not dated, signed, or complete with the title of the preparer. In addition, the records that are still in existence contained little detail as well as discrepancies and miscalculations. The evidence thus suggests that

even where American attempted to maintain corporate records, such records were inadequate.

13. Lutyk testified that officers' meetings were held only occasionally, and that no records of these meetings were kept aside from the organizational meeting in 1992. He also testified that no reports were ever issued to the other officers.

14. Lutyk's contention that business assets were titled in the name of the corporation was unrefuted.

15. No dividends were paid during American's operational years, and no shareholder meetings were held, as Lutyk was the sole shareholder.

## II. CONCLUSIONS OF LAW

### A. Background

1. This court has jurisdiction over this action pursuant to Section 502(e)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(e)(1).

2. In order for plaintiff to prevail, it must show either: 1) that the unremitted contributions are "assets" within the meaning of 29 U.S.C. § 1002(21)(A)(i), thereby imposing personal liability upon Lutyk as a fiduciary under Section 409 of ERISA, 29 U.S.C. § 1109(a); or 2) that Lutyk is personally liable for American's debts by virtue of piercing of the corporate veil.

### B. Under the Facts and Circumstances of This Case, Unremitted Contributions Are Not "Assets"

1. Section 409 of ERISA, 29 U.S.C. § 1109(a) imposes personal liability on "[a]ny person who is a fiduciary with re-

spect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries." Plaintiff claims that Lutyk is a fiduciary specifically under 29 U.S.C. § 1002(21)(A)(i), which states that "a person is a fiduciary with respect to a plan to the extent (i) he ... exercises any authority or control respecting management or disposition of its assets." Defendant does not dispute that he exercised the requisite authority or control with respect to the management or disposition of the unremitted contributions at issue in this case, but vigorously disputes that such contributions are "assets."

2. To answer whether unremitted contributions are "assets" for the purpose of liability under 29 U.S.C. § 1109(a), courts in the Third Circuit look to the terms of the agreement under which the obligation to pay the contributions arise. *See Galgay v. Gangloff*, 677 F.Supp. 295, 301–02 (M.D.Pa.1987), *aff'd*, 932 F.2d 959 (3d Cir. 1991) (table) (delinquent contributions held to be assets pursuant to the terms of the wage agreement); *Young v. West Coast Industrial Relations Assoc., Inc.*, 763 F.Supp. 64, 75 (D.Del.1991) (in case involving 18 U.S.C. § 664, an analogous criminal statute, delinquent contributions held to be debt, not vested assets, where agreement stated that employer was liable for "all arrears in payment" of ERISA plan contributions), *aff'd without opinion*, 961 F.2d 1570 (3rd Cir.1992); *PMTA–ILA Containerization Fund v. Rose*, No. 94–5635, 1995 WL 461269, at *4 (E.D.Pa. Aug.2, 1995) (delinquent contributions held to be assets where agreement stated that monies "accrued to" fund were "vested" in the fund trustees).[1]

---

1. The approach taken by courts in the Third Circuit differs from that taken by other courts, which follow a general rule that contributions owed but not delivered are plan assets. *See, e.g., Board of Trustees of the Air-conditioning and Refrigeration Industry Health*

*and Welfare Trust Fund v. J.R.D. Mechanical Services, Inc. ("Divers")*, 99 F.Supp.2d. 1115, 1120 and n. 4 (C.D.Cal.1999) (finding that both employer contributions and employee wage deductions are plan assets, regardless of whether such money is ever in fact conveyed

3. In *Galgay*, the court found that delinquent employer contributions were "assets" based upon the wage agreement's provision that "all the monies paid into and/or *due and owing* said fund shall be *vested in* and remain exclusively in the trustees of the fund." *Galgay*, 677 F.Supp. at 300–01 (emphasis added). This is in accord with holdings in other Circuits addressing agreements containing the same or extremely similar language. *See Hanley v. Giordano's Restaurant*, No. 94–4696, 1995 WL 442143, at *4 (S.D.N.Y. Jul. 26, 1995); *Connors v. Paybra Mining Co.*, 807 F.Supp. 1242, 1246 (S.D.W.Va.1992). Another court in this district held that unremitted contributions were "assets" based on the agreement's provision that "[t]itle to all of the money, property, and income ... accrued to the fund shall be vested in and remain exclusively in the board of trustees of the fund," where "accrued to" was synonymous with "due and owing." *PMTA–ILA*, 1995 WL 461269, at *4. However, the language in the Trust Documents in this case is not as clear.

4. The Trust Documents protect the "Trust Fund" from liabilities of employers and other entities, indicating that the Trust Fund is an "asset." *See United States v. Panepinto*, 818 F.Supp. 48, 51 (E.D.N.Y.1993) (holding that where agreement stated that "the employer shall [not] have any legal or equitable right, title or interest" in certain monies, such monies were plan "assets"). Thus, it is significant whether unremitted contributions are considered to be part of the "Trust Fund."

 5. As reviewed previously, the Trust Documents contain conflicting provisions as to whether the "Trust Fund" include owed but unremitted contributions. The court finds that there is no plain language in the Trust Documents which makes unremitted employer contributions a trust "asset."

6. With respect to employee wage deductions, 29 C.F.R. 2510.3–102(a) and (c) (1989) state that plan assets "include ... amounts that *a participant has withheld from his wages by an employer*, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets," but no later than 90 days after the date such contributions are due. Thus, employee wage deductions that have been withheld by the employer but not remitted to the fund became plan "assets" at the time specified by the regulations.

 7. The parties ·agree that there are no unremitted employee wage deductions at this time. However, a plaintiff may still seek interest and liquidated damages associated with contributions untimely remitted after the commencement of a lawsuit. *See Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Building Tech, Inc.*, 747 F.Supp. 288, 296–97 (E.D.Pa.1990).

 8. The defendant, however, disputes the assessment of $332.54 in liquidated damages and interest associated with the $2,524.74 in employee wage deductions that was paid on December 13, 2000. Defendant's argument appears to be that since the consent judgment already accounted for liquidated damages and interest on the $2,524.74, the $332.54 was part of the $40,000.00 defendant already paid pursuant to the terms of the consent judgment. However, according to Robert Milano, Executive Director of the NEI Funds, the NEI Funds followed their nor-

---

to the plan, and noting disagreement with courts in the Third Circuit); *United States v. Grizzle*, 933 F.2d 943, 947–48 (11th Cir.1991) (finding that liability attached under analogous criminal statute, 18 U.S.C. § 664, where employer exercised control over employee contributions deducted from their wages).

mal practice in applying the $40,000.00 to the oldest delinquent contributions covered by the consent judgment, and none of the $40,000.00 was applied to any outstanding interest or liquidated damages. Thus, the interest and liquidated damages on the $2,524.74 has not yet been paid and the defendant may be held liable for it to the extent that personal liability for the amounts covered by the consent judgment is imposed as a result of this action. Furthermore, plaintiff may seek additional interest on the $2,524.74 accrued since the consent judgment. The court notes, however, that interest on the $2,524.74 accrued prior to the consent judgment should not be counted twice, that is, it should not be represented once in the calculations prepared in connection with the consent judgment and again in the calculations done in this action.

### C. *Piercing the Corporate Veil Is Justified In This Case*

#### 1. *Background*

■ a. Federal law governs liability for a breach of a labor contract between a union and employer, including liability based on a theory of corporate veil piercing. *American Bell Inc. v. Federation of Telephone Workers of Pennsylvania,* 736 F.2d 879, 886 (3d Cir.1984); *see also United Food and Commercial Workers Union v. Fleming Foods East, Inc.,* 105 F.Supp.2d 379, 388 (D.N.J.2000) (addressing intercorporate alter ego liability for recovery of delinquent contributions under ERISA and LMRA).

■ b. The Third Circuit has set forth the following factors for a court to consider in determining whether to pierce a corporate veil:

First is whether the corporation is grossly undercapitalized for its purposes. Other factors are failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. Also, the situation must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness.

*United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981) (citing *DeWitt Truck Brokers, Inc., v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976)) (punctuation omitted). The *Pisani* list of factors is not conjunctive, *i.e.,* not all of the factors need to be present for the alter ego doctrine to apply, nor is it an exclusive list. *Galgay,* 677 F.Supp. at 299–300. However, in order to pierce the corporate veil, "specific, unusual circumstances" must exist. *Id.*

■ c. As described in *DeWitt,* 540 F.2d at 685, the focus of a veil-piercing inquiry is "how the corporation operated and the individual defendant's relationship to that operation." The inquiry is a factual one, and must be supported by the record. *Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Ambrose,* 727 F.2d 279, 283 (3d Cir.1983), *overruled in part on other grounds by McMahon v. McDowell,* 794 F.2d 100, 108 (3d Cir.1986). The burden of proof rests with the party attempting to pierce the corporate veil. *Ambrose,* 727 F.2d at 284.

■ 2. *Insolvency of Debtor Corporation.* One of the factors is "the insolvency of the debtor corporation at the time." *Pisani,* 646 F.2d at 88. Here, the relevant time period is the time at which the corporation incurred liability, that is, from May 1997 to November 1999. *See Connors v. Peles,* 724 F.Supp. 1538, 1568 (W.D.Pa. 1989). As noted previously, testimony and

documents support the insolvency of American beginning at least in 1996 and continuing until it ceased operations in late 1999.

### 3. *Undercapitalization*

 a. Whether a corporation is grossly undercapitalized for the purposes of the corporate undertaking is of particular importance in a veil-piercing analysis, especially in the case of a closely held corporation. *See United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del. 1988) (citing *DeWitt*, 540 F.2d at 685), *aff'd*, No. 89–3034, 879 F.2d 857 (3d Cir. June 6, 1989); *Connors*, 724 F.Supp. at 1561 ("One of the most compelling factors is adequacy of capitalization."). The obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations. *Golden Acres*, 702 F.Supp. at 1104.

 b. The ratio of loans to equity investments may be an indicator of undercapitalization. *See Plumbers' Pension Fund, Local 130, U.A. v. A–Best Plumbing & Sewer*, No. 88–3087, 1992 WL 59098, at *7 (N.D.Ill. Mar.16, 1992) (loan of $35,000 was significant, especially in comparison with $1,000 equity investment). American's $25,000 in capital stock is out of proportion to the approximately $96,000.00 in shareholder loans accumulated by the beginning of 1995, which rose to $174,881.00 by the end of the next year and remained at that level until at least 1997 or 1998.

### 4. *Siphoning of Funds*

 a. The repayment of legitimate shareholder loans by itself does not constitute siphoning and is insufficient to pierce the corporate veil, even if the transaction may constitute fraud. *See Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 (3d Cir.1994) (loan repayments made

when corporation is insolvent may be voidable or fraudulent, but do not justify veil piercing; rather, a "proponent of an alter ego theory must show more"), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Connors*, 724 F.Supp. at 1569 (finding it "very questionable" that legitimate loan repayments to the defendant constituted siphoning, even though those repayments "may very well have been pertinent in a bankruptcy 'preference' action, or the subject of a separate ERISA claim under the avoidance statute").

b. However, the repayment of loans from shareholders or other diversion of corporate assets at a time when the company's finances are troubled may strongly indicate siphoning. *See Pisani*, 646 F.2d at 88 (fact that loans to corporate from defendant were repaid loans while the corporation was failing favored veil piercing); *Kaplan*, 19 F.3d at 1523 (while not sufficient to pierce the veil, repayment of shareholder loans following the stock market crash and prior to a workout of financial dispute was the defendant's "the most serious act" with respect to veil piercing analysis); *A–Best*, 1992 WL 59098, at *6 (shareholder loan repayment during insolvency, prior to arbitration award and after cessation of operations "g[a]ve rise to the inescapable inference that the [defendants] drained money from [the company] to avoid impending liability"); *United States v. Thomas*, 515 F.Supp. 1351, 1357 (W.D.Tex.1981) (veil pierced to recover unpaid Medicare contributions where, at time that corporation was failing, assets were dissipated to sole shareholder's benefit by means including loan repayments); *State Bank of Cerro Gordo v. Benton*, 22 Ill. App.3d 1007, 317 N.E.2d 578 (1974) (veil pierced where loans were repaid to 99% shareholder, who profited to the exclusion of other creditors).

c. This case is not one in which the defendant, in loaning the corporation large sums of money, acted like a "good samaritan for the survival of the corporation." *Pearson v. Component Technology Corp.,* 247 F.3d 471, 502 (3d Cir.2001); *see also Ambrose,* 727 F.2d at 284 (overruling veil-piercing where defendants acted as "good samaritans" in mortgaging their own home to loan money to corporation in an attempt to keep it solvent). In *Pearson,* the court found that the shareholder loans did not constitute permanent undercapitalization, but rather were temporary cash infusions to keep the company viable—a "rescue operation" that should not be discouraged. *Pearson,* at 502.

d. In contrast, in this case, American's tax records show a long history of significant shareholder loans, that is, loans from Lutyk, going back at least to December 1994 before being repaid in substantial part by the end of 1998. Thus, the bulk of the company's debt to Lutyk was carried during much of the company's existence, which does not suggest a temporary infusion of cash consistent with "good samaritan" lending. Furthermore, it is again emphasized that the defendant's loans to the corporation were largely repaid in 1997 or 1998, while the corporation was struggling to survive. *See Ambrose,* 727 F.2d at 284 (emphasizing significance of loan repayments made while corporation is failing when distinguishing "good samaritan" loans from loans evidencing siphoning). In addition, the extent of undercapitalization and the imbalance between loan and equity investments points to siphoning, rather than samaritanship. *See A–Best,* 1992 WL 59098, at *6 (repayment of loan of $35,000 was significant, especially in comparison with equity investment of $1,000).

e. The use of corporate funds for personal benefits—again, particularly at a time of financial distress—also supports piercing the corporate veil. *See. .e.g., Crane v. Green & Freedman Baking Co.,* 134 F.3d 17, 23–24 (1st Cir.1998) ("Courts have routinely viewed the wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress as a fraud that can justify piercing the corporate veil.") (citations omitted); *Golden Acres,* 702 F.Supp. at 1106 (regular unidentified withdrawals of corporate funds to controlling individuals over two and a half year period, despite "a mounting mortgage debt and an insolvent corporate shell," favored veil piercing). Commingling of funds is also often considered in determining whether to pierce the corporate veil. *See, e.g., Schaffer v. Benjamin,* No. 90–6225, 1992 WL 59152, at *7 (E.D.Pa. Mar.18, 1992), *aff'd,* No. 92–1312, 980 F.2d 724 (3d Cir. Oct.30, 1992). Lutyk disputed the use of corporate funds for personal expenses and any other commingling; however, this is belied by his use of "partner's drawings" for living expenses, and by the use of corporate funds for golf and yacht club fees despite infrequent business uses and for other unidentified travel and entertainment expenses.

5. *Dividends.* American did not pay dividends, and the non-payment of dividends is usually a factor favoring piercing of the corporate veil. However, as the defendant is the sole shareholder, non-payment of dividends takes on a divided significance, as it may be evidence that the defendant did not seek to siphon assets from the company, albeit while disregarding the corporate formalities of dividend payment. *See Local 397, International Union of Electronic, Electrical Salaried Machine and Furniture Workers v. Midwest Fasteners,* 779 F.Supp. 788, 794 (D.N.J.1992). However, in this case, where large sums of money have been directed to the defendant by other means,

the nonpayment of dividends to himself does not weigh in favor of the defendant.

6. *Corporate Formalities and Corporate Records.* Although courts often do not hold closely-held corporations to strict standards with respect to corporate formalities, disregard of corporate formalities remains a factor of some significance even where the corporation is closely held. *See Golden Acres,* 702 F.Supp. at 1105–06. A corporation that keeps minimal records, such as tax returns, accounting books, insurance records, and bank records, has not necessarily met its obligation. *See id.,* 702 F.Supp. at 1105; *A–Best,* 1992 WL 59098, at *4. Here, the scant corporate records that were produced were sufficiently incompetent so as to raise the inference that the obligation of corporate recordkeeping was not properly met. Furthermore, Lutyk admitted that officers' meetings were held only occasionally, and that no minutes were kept of these meetings.

7. *Non–Functionality of Officers and Directors and Lack of Shareholder Meetings.* Where a corporation is closely held, the nonfunctionality of other officers and directors and the lack of shareholder meetings are not sufficient in themselves to pierce the corporate veil.

8. *Facade for Operations of Dominant Shareholder.* When determining if a corporation is merely a facade, one factor is whether the shareholder owns title to necessary assets, indicating an intent to protect such assets from business misfortunes. *See Connors,* 724 F.Supp. at 1564 (title of assets was "[p]erhaps the most dispositive point" in determining that corporation was not a facade). As noted previously, there is no evidence to refute Lutyk's contention that business assets were titled in the name of the corporation. There was no other evidence presented to indicate that American was a sham corporation or that it was not engaged in *bona fide* elevator work.

9. *Element of Injustice*

a. Finally, in order to pierce the corporate veil, it is required that "the situation ... present an element of injustice or fundamental unfairness, but a number of [*Pisani* ] factors can be sufficient to show such unfairness." *Pisani,* 646 F.2d at 88. The factors previously discussed are sufficient to show a fundamental unfairness in permitting the defendant to enjoy the protections normally. afforded by the corporate form.

b. In the context of assessing the presence of injustice in this case, the court notes Lutyk's claim that in 1999 the union refused to refer employees to American, and therefore it shares some culpability in American's inability to continue its operations and pay its contributions. However, American's delinquencies began to accrue several years before this alleged labor shortage at the directive of the union, and the court does not find the defendant's estoppel argument meritorious.

10. In sum, the court concludes that piercing the corporate veil is warranted in this case, as the corporation was grossly undercapitalized and insolvent during its period of delinquency; funds were siphoned to the sole shareholder and director at a time of financial distress, most significantly by means of the repayment of substantial shareholder loans, to the injury of other creditors; existing records show that corporate recordkeeping and procedures were inadequate; and the requisite element of injustice is present.

D. *Attorney's Fees and Costs*

1. Recovery of attorney's fees and costs are mandatory under Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), even where plaintiff is only. partially successful on their claims. *See Trustees of Colorado Statewide Ironworkers v. A. & P. Steel,* 824 F.2d 817, 818–19 (10th Cir.1987).

## JUDGMENT

AND NOW, this 4th day of May, 2001, judgment is entered on the claims pled in the complaint in FAVOR of plaintiff, Trustees of the National Elevator Industry Pension, Health Benefit and Educational Funds, and AGAINST the defendant, Andrew Lutyk, in the amount of $287,627.43.