TEAMSTERS HEALTH AND WELFARE FUND OF PHILADELPHIA AND VICINITY, et. al., Plaintiffs,

v.

WORLD TRANSPORTATION, INC., et. al., Defendants.

No. CIV.A. 00–5562.

United States District Court, E.D. Pennsylvania.

Jan. 28, 2003.

---

Neal Goldstein, Susan A. Murray, Freedman & Lorry, P.C., Philadelphia, PA, for plaintiffs.

Stephen J. Sundheim, Pepper Hamilton, LLP, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Plaintiffs Teamsters Health and Welfare Fund ("Welfare Fund"), Teamsters Pension Trust Fund ("Pension Trust Fund" and jointly with Welfare Fund, "Funds"), and William J. Einhorn ("Einhorn" and jointly with Funds, "Plaintiffs") filed a Complaint on November 1, 2000, alleging that Defendants Trans Freight Systems, Inc. ("Trans Freight"), World Transportation, Inc. ("World"), and Richard Rueda ("Rueda" and jointly with Trans Freight and World, "Defendants") failed to remit employer contributions and that Defendant Richard Rueda, individually, was personally liable on piercing the corporate veil and breach of fiduciary duty claims. The parties have stipulated that Defendant Trans Freight is liable for World's obligations to the Funds and that the damages total $390,744.58. The non-jury trial in this matter was held on August 5 and 6, 2002 to determine whether Rueda could be held personally liable.

As discussed below, the Court finds that Defendant Richard Rueda is not personally liable for the obligations to the Funds because there is insufficient evidence to pierce the corporate veil and to find fiduciary liability. We now make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiffs Teamsters Health and Welfare Fund and Teamsters Pension Trust Fund are trust funds under 29 U.S.C. § 186(c)(5) and have their principal place of business in Philadelphia, PA.

2. Plaintiff William J. Einhorn is a fiduciary of the Funds within the meaning of 29 U.S.C. § 1002(21).

3. Defendants World Transportation, Inc., Trans Freight Systems, Inc., and Richard S. Rueda maintained their principal place of business in Philadelphia, PA.

4. World was an affiliate corporation of Trans Freight, a Pennsylvania corporation which performed management, legal, administrative, financial and accounting, human resources, and payroll services.

5. Richard Rueda was the sole shareholder, sole director, and Chief Executive Officer of Defendants Trans Freight and World.

6. The officers of World were the same officers of Trans Freight. They included Richard Rueda, CEO and later President; Peter Albert, President; Jorge Olin, Vice President of Operations; Stephen Drechler, Vice President of Finance and Secretary; Gregory Christian, Vice President of Administration and in-house counsel.

7. On or about March 7, 1994, World and Teamsters Local 929 entered into a collective bargaining agreement for the term of March 7, 1994 to December 23, 1998.

8. World was also a party to collective bargaining agreements with Teamsters Local 107, effective March 1, 1994.

9. Pursuant to collective bargaining agreements between Teamsters Local 107 and Teamsters Local 929, respectively, World was obligated to make monthly contributions to the Pension Trust Fund and the Welfare Fund on behalf of represented employees.

10. The Pension Trust Fund Agreement was amended effective July 1, 2000 to state: As each hour is worked and/or paid for which contributions are payable to the PENSION FUND, the payment of contributions due from the COVERED EMPLOYER to the PENSION FUND accrues and shall be considered as being as held in trust by the COVERED EMPLOYER for the benefit of the PENSION FUND to whom such trust money is due

and payable. *See* Joint Pre–Trial Memorandum ¶ 11.

11. The human resources department at Trans Freight was responsible for calculating World's contribution to the Funds according to the collective bargaining agreements.

12. The financial department would approve and prepare contribution checks which would then be signed by an officer, including Rueda, Olin, and Drechsler.

13. When there were discrepancies in contributions, the Funds' practice would be to contact Defendants and send a corrected bill for past due contributions.

14. After the Funds notified World that it failed to pay contributions to the Pension Trust Fund for Local 929 overtime hours, World acknowledged the obligation and started making fund contributions for Local 929 overtime hours in 1997.

15. At the Funds' request, World submitted to an audit of its records for the period from 1994 through 1997. The audit commenced in 1998. A second audit, which commenced in 2001 was conducted for the years 1998 to October 2000.

16. On November 3, 2002, the Funds notified the Defendants about the final results of the 1994–97 audit. The 1998–2000 audit was reported on September 13, 2001.

17. The parties have stipulated that Defendant Trans Freight is liable for World's obligations to the Funds. *See* Amendment to Joint Pre–Trial Memorandum ¶ 1.

18. The audits revealed that the damages owed to the Funds by Defendants World and Trans Freight total $390,744.58. *Id.* at ¶ 2.

19. In 1998, Trans Freight obtained a line of credit for ten million dollars at First Union Bank. All assets from the affiliates served as collateral for the loan.

20. On October 15, 2000, First Union Bank foreclosed on the loan and seized Trans Freight's assets.

21. Trans Freight ceased to operate after October 2000.

## DISCUSSION

### I. *Piercing the Corporate Veil*

▆▆▆▆ An individual can be personally liable for the debts of a corporate entity if the court pierces the corporate veil by finding the corporate identity was merely an alter ego. In determining whether to pierce the corporate veil and find an alter ego, the court considers: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation; (5) siphoning of funds by the dominant shareholder; (6) non-functioning of other officers and directors; (7) absence of corporate records; and (8) the fact that the corporation is a mere façade for the operations of the dominant stockholder. *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994). "In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." *Id.* Since an alter ego theory is "akin to and has elements of fraud," the plaintiff has the burden of showing liability by clear and convincing evidence. *Id.* at 1522.

Plaintiffs argued that there is sufficient evidence to justify piercing the corporate veil to hold Defendant Richard Rueda liable for corporate obligations. We consider the veil piercing factors[1] and this Court

---

**1.** We do not detail the non-payment of dividends, insolvency, and façade factors because

finds that there is no clear and convincing evidence that justifies imposing alter ego liability on Defendant Rueda personally.

### A. *Gross Undercapitalization*

■ While we recognize that gross undercapitalization is "of particular importance in a veil-piercing analysis, especially in the case of a closely held corporation" such as Trans Freight, we find no evidence that the corporation was grossly undercapitalized. *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk,* 140 F.Supp.2d 447, 458 (E.D.Pa.2001). Rather, Trans Freight operated with solvency for at least several years. It was not so undercapitalized that it was unable to meet debts in the normal course of business. It appears to this Court that Trans Freight started to face financial difficulty in 1997 after it lost a major contract with the retailer Strawbridge and Clothier. Despite this setback, Trans Freight was still adequately capitalized such that it was able to secure a ten million dollar loan from First Union Bank in 1998.

### B. *Siphoning of Funds by Dominant Shareholder*

■ The "repayment of legitimate shareholder loans by itself does not constitute siphoning and is insufficient to pierce the corporate veil, even if the transaction may constitute fraud;" however, the repayment of loans from shareholders or other diversion of corporate assets at a time when the company's finances are troubled may strongly indicate siphoning. *Lutyk,* 140 F.Supp.2d at 458. Furthermore, "the use of corporate funds for personal benefits—again, particularly especially at a time of financial distress—also supports piercing the corporate veil." *Id.* at 459.

Commingling of funds can also be considered in piercing the veil inquiries. *Id.*

■ Plaintiffs claim that Trans Freight made substantial charitable donations while undergoing financial problems. As a result, Rueda, Plaintiffs argue, received "a certain social, personal benefit." *See* Plaintiffs' Proposed Findings of Fact, 19. We find that these charitable donations were not siphoned for personal benefit but rather, they were legitimate business expenses, which served advertising and business generating purposes. Additionally, this Court finds no other evidence of improper uses of funds for personal benefit. Plaintiffs question Rueda's use of a company boat, but fail to present evidence that it was bought, maintained, or used for personal benefit. Defendant Rueda contends that rather than siphoning funds, he infused funds into the corporation with loans that were unlikely to be repaid. It appears to this Court that this case is in line with one in which the defendant, "in loaning the corporation large sums of money, acted like a good samaritan for the survival of the corporation." *Lutyk,* 140 F.Supp.2d at 459; *see also Carpenters Health and Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir. 1983) (overruling veil-piercing because defendants acted as "good samaritans" by mortgaging home in an attempt to keep the corporation solvent).

### 3. *Corporate Formalities and Records*

■ "Although courts often do not hold closely-held corporations to strict standards with respect to corporate formalities, disregard of corporate formalities remains a factor of some significance even where the corporation is closely held." *Lutyk,* 140 F.Supp.2d at 460. Although

the non-payment of dividends is undisputed and the lack of evidence makes the other factors superfluous to our determination whether to pierce the corporate veil.

the parties have stipulated that Trans Freight is liable for World's obligations, this Court finds that there is no evidence showing that Trans Freight disregarded corporate formalities and records such that Defendant Rueda should be held personally liable.

### D. *Non-functioning officers*

■ It is clear from the record that there were functioning officers with duties and responsibilities in the daily operations of Trans Freight. For example, Peter Albert served as President before his resignation. Jorge Oliu was Vice President of Operations and supervised administrative and operational matters. Stephen Drechler served as Vice President of Finance and Chief Financial Officer and oversaw accounting and finance matters. Gregg Christian was Vice President and in-house counsel. Each individual was involved with the business of Trans Freight along with Defendant Rueda.

Therefore, with the evidence on record, we do not find that Trans Freight operated as a mere façade for the Defendant Rueda, and we will not pierce the corporate veil.

## II. *Fiduciary Liability*

■ Plaintiffs aver Defendant Richard Rueda, individually, is personally liable as a fiduciary under § 3(21)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(21)(A). A fiduciary is personally liable for a breach of fiduciary duty under 29 U.S.C. § 1109(a). ERISA defines a fiduciary as a person who "exercises any discretionary authority or discretionary control respecting management of such plan or any authority or control respecting the management or disposition of assets." 29 U.S.C. § 1002(21)(A)(i). "A person is an ERISA fiduciary if he exercises control or authori-

ty over the plan's assets, management or administration." *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d Cir.1994). In order for an individual to be held liable as an ERISA fiduciary, the court must determine: 1) whether the unpaid contributions were plan assets; and 2) whether the individual exercised discretionary control or authority over such assets. *PMTA–ILA Containerization Fund v. Rose,* No. 94–5635, 1995 WL 461269, at *4 (E.D.Pa. Aug.2, 1995).

### A. *The Unpaid Contributions Were Not Plan Assets*

The ERISA statute does not define what constitutes "plan assets," however, courts have looked to the agreement which created the employee benefit plan in order to define plan assets. *See id.; Galgay v. Gangloff,* 677 F.Supp. 295 (E.D.Pa.1987). For example, Plaintiffs cite *Galgay v. Gangloff,* 677 F.Supp. 295 (E.D.Pa.1987) in support of their argument that unpaid contributions are assets of the Fund at the time the money was due and owing. In *Galgay,* the court found unpaid contributions to be fund assets because of the "clear and undisputed language" of the agreement which vested delinquent contributions when the money was due and owing. *Galgay,* 677 F.Supp. at 301. The *Galgay* court, however, also specifically pointed out that "the arguments and circumstances in this case are unusual, and the court by no means holds as a general rule that employers may be liable under ERISA as fiduciaries merely because of delinquent contributions to a multi-employer plan." *Id.*

■ In this case, we find that there is no clear and undisputed language in the Pension Trust Fund Agreement. The parties have stipulated that the Trust Fund Agreement was amended in July 2000 to incorporate unpaid contributions as fund

assets. As amended, it states: "As each hour is worked and/or paid for which contributions are payable to the pension fund, the payment of contributions due from the covered employer to the pension fund accrues and shall be considered as being held in trust by the covered employer for the benefit of the pension fund to whom such trust money is due and payable." *See* Joint Pre–Trial Memorandum ¶ 11.

Prior to the July 2000 amendment, however, we find no evidence from the record that the Trust Fund Agreement clearly and undisputedly included unpaid contributions as plan assets. Regardless of the Funds' practice before the amendment, without "clear and undisputed language" to the contrary, we consider past due contributions not to be booked as plan assets until the delinquent amounts were determined by an audit or contribution report. *See* N.T., 8/5/02 of Einhorn, 22; N.T., 8/5/02 of Duffy, 74–75. It appears to the Court from the record that without knowing the correct amount due, unpaid contributions could not be booked as assets. Since there was no contribution report and the results of the 1994–97 and 1998–2000 audits were not known until November 3, 2002 and September 13, 2001, respectively, we find that past due contributions could not be considered booked as plan assets until those times when the amounts owed were ascertained.

### B. *Defendant Rueda Did Not Exercise Discretionary Control Over Assets*

Even assuming *arguendo* that the unpaid contributions could be considered plan assets, Plaintiffs still fail to show fiduciary liability because Defendant Rueda did not exercise discretionary authority or control over plan assets. Rueda was only minimally involved with the fund contribution procedure. The Human Resource Director would calculate the fund contri-butions and request a check from the financial department. After the financial department approved the check, an officer would sign it. Although Defendant Rueda occasionally signed company checks, other officers and departments clearly handled the contributions to and the relationship with the Funds.

In cases of underpayments to the Funds, the general practice for over twenty years would be that the Funds would notify Defendants and send a corrected invoice within a few months. Defendants would wait for the invoice for the corrected amount and then remit the payment. When there was an overpayment to the Funds, the Funds would also send a check for the difference. *See* N.T., 8/6/02 of Rueda, 97, 103.

■ We find that Plaintiffs have presented no evidence to demonstrate that Defendant Rueda exercised any discretionary control over plan asset or purposely diverted fund contributions. It appears to this Court that Rueda acted consistently with customary procedure once the Pension Fund informed him that "a bill was coming." *See* N.T., 8/6/02 of Rueda, 98. In fact, when Defendants were informed about an outstanding obligation in June 1997, Rueda attempted to find out what the obligation was instead of trying to avoid paying it. When Defendants never received a corrected invoice, Defendant Rueda instructed Stephen Dreschler to contact the Fund manager and resolve the issue. *See* N.T., 8/6/02 of Rueda, 97. This Court further notes two other factors that cut against Plaintiffs' argument. First, starting in 1998, Rueda's role in the management of Trans Freight was significantly diminished because of kidney failure and other related health problems. Second, there was a considerable delay from the notification about the miscalculated fund contributions and the results of the audit.

Although Plaintiffs contend that Defendants were obligated to hire an outside accountant to review the contribution payment records, we note that the results of Plaintiffs' audits, which commenced in 1998 and 2001 respectively, were not known until well after First Union bank seized Trans Freight's assets on October 15, 2000. This Court finds that there is no evidence on the record that demonstrates that Defendant Rueda avoided, or even was unwilling, to pay the unpaid contribution obligations at anytime between June 1997 and October 2000 when the assets were seized.

Thus, the Court finds that Defendant Rueda is not personally liable as a fiduciary because the unpaid contributions were not plan assets and Rueda did not exercise discretionary control over plan assets.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to §§ 505 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, respectively, and § 301(a) of the Labor Management Relations Act, as amended, 29 § 185(a).

2. Plaintiffs have failed to show sufficient evidence to pierce the corporate veil.

3. Defendant Richard Rueda is not personally liable as an alter ego of Trans Freight Systems, Inc.

4. Plaintiffs have failed to prove sufficient evidence that the unpaid contributions were plan assets and that Rueda exercised discretionary control over plan assets.

5. Defendant Richard Rueda is not a fiduciary under 29 U.S.C. § 1002(21)(A) and is not liable for a breach of fiduciary liability under 29 U.S.C. § 1109(a).

## CONCLUSION

An appropriate Order follows.

## *ORDER*

AND NOW, this 28th day of January, 2003, upon consideration of evidence presented at trial on August 5 and 6, 2002, and Plaintiffs' and Defendants' proposed findings of fact and conclusions of law, it is hereby ORDERED, in accordance with the foregoing memorandum, as follows:

1. Judgment is entered in favor of Plaintiffs on Count One of Plaintiffs' Complaint against Defendants Trans Freight Systems, Inc. and World Transportation, Inc.

2. Trans Freight Systems, Inc. is liable for World Transportation Inc.'s obligation to the Plaintiffs for damages totaling $390,744.58.

3. Judgment is entered in favor of Defendant Richard Rueda on Count Two of Plaintiffs' Complaint.

4. Judgment is entered in favor of Defendant Richard Rueda on Count Three of Plaintiffs' Complaint.