## Advanced Telephone Systems Inc. v. Com-Net Professional Mobile Radio LLC

C.P. of Allegheny County, no. GD 00-9001.

*Joseph Decker* and *Kenneth S. Kornacki,* for plaintiff. *William M. Wycoff, Alice B. Mittinger* and *Jeff D. Aronsohn Jr.,* for defendants.

FRIEDMAN, *J.,* May 15, 2002—

## INTRODUCTION

This case arose from a contract between plaintiff, Advanced Telephone Systems Inc., t/d/b/a ATS Mobile Communications and defendant Com-Net Professional Mobile Radio LLC. In addition to recovering damages from Com-Net PMR LLC for an alleged breach of the contract, ATS also sought to recover damages from the other defendants by piercing the corporate veil.

At argument on motions in limine, it became evident that common facts gave rise to both an action at law (plaintiff vs. Com-Net PMR LLC) in assumpsit and an action in equity (plaintiff vs. all other defendants) for piercing the corporate veil. Therefore, only one evidentiary proceeding had to be conducted. This was followed by bifurcated decisions, a jury verdict for the action at law, and the instant adjudication for the action in equity. The trial was held before the undersigned commencing April 1, 2002. At the conclusion of the evidence, the court directed a verdict on the issue of liability against defendant Com-Net PMR LLC, only, and the case was submitted to the jury on the issue of damages. On April 5, 2002, the jury returned a verdict in favor of ATS and

against Com-Net PMR LLC in the amount of "$2.5 million plus attorney's fees [in an uncontested amount of $102,000]."[1]

The jury's role in the case was thereby concluded and we then proceeded, in equity, to consideration of whether to pierce the corporate veil and impose liability on the other defendants. Extensive oral argument was heard by the undersigned on April 16, 2002, after both parties had submitted proposed findings of fact and conclusions of law. For the reasons set forth below, we conclude that we cannot pierce the corporate veil and cannot impose liability for the breach by Com-Net PMR LLC on any of the remaining defendants.

## ISSUES INVOLVED

ATS seeks to pierce the corporate veil of Com-Net PMR LLC so as to recover the jury award against it from the other defendants. ATS contends that the LLC form was misused by the other defendants so that the LLC became their alter ego, rendering defendants undeserving of LLC protection. ATS attempted to prove, inter alia, that Com-Net PMR LLC was never adequately capitalized, and that the individual defendants, especially Steven Savor Jr. and Stephen Frobouck, induced plaintiff to enter the contract with Com-Net PMR LLC by representing that it was backed by the financial strength of the W.E. Anderson Group Inc. and its various enterprises.

---

1. Plaintiff has filed a motion to mold the jury verdict to include additional attorney's fees and costs from March 1 through April 12, 2002, which remains pending, although it is believed to be unopposed.

### FINDINGS OF FACT

As an aid to deciding the non-jury portion of the captioned matter, the court permitted the parties to submit proposed findings of fact. The facts summarized below, which the court finds material and supported by the credible evidence, are largely undisputed. The omission of any proposed finding of fact or portions thereof should not necessarily be regarded as a rejection of the proposed finding or the portion omitted, but rather as an indication that the court regarded it as either repetitive or immaterial to its decision, or that the court, without a full transcript, was unsure of a particular detail contained in the proposed finding. Certain proposed findings of fact which are specifically rejected will be indicated later herein. For the convenience of the parties, the court has noted where the substance of each finding was proposed by placing either P-__ or D-__ at the end of each.

(1) At issue in this proceeding is an "800 MHz subscriber service agreement," executed on March 24, 1999, between ATS and Com-Net PMR LLC. The subject matter of the agreement was the use of 14 800 MHz radio frequency channels for which ATS held licenses from the Federal Communications Commission. (Plaintiff exhibit 1.) (D-2) (P-6)

(2) Prior to entering the service agreement, ATS leased the 14 channels to ERI on an undocumented, month-to-month basis. (Adamson and Beatty testimony.) (D-54) (P-10)

(3) Pursuant to the service agreement, Com-Net PMR LLC leased the 14 800 MHz FCC channels from ATS for $2,000 per channel per month. The term of the serv-

ice agreement was to be 15 years. (Plaintiff exhibit 1.) (D-56) (P-6)

(4) During the negotiations of the service agreement, ATS was represented by counsel and Savor, an officer of both Com-Net Development Group LLC, and the Anderson Group, was a practicing attorney. (Adamson and Savor testimony.) (D-57)

(5) ATS's counsel was a Washington DC lawyer who specialized in communications law and who drafted the service agreement and implemented negotiated changes to it. (Adamson testimony.) (D-59)

(6) Initial drafts of the service agreement, prepared by plaintiff's counsel, identify Com-Net Development Group LLC as the signatory of the service agreement. (Adamson testimony; defense exhibits 82, 84 and 85.) (D-60) (P-15)

(7) Adamson, ATS's treasurer and CEO, knew that the early drafts of the service agreement were with Com-Net Development LLC and he knew that ATS would be entering into the service agreement with a limited liability company. (Adamson testimony.) (D-62)

(8) Prior to the time the parties entered the service agreement, Adamson knew what limited liability companies were. (Adamson testimony.) (D-66)

(9) Before the service agreement was executed, Adamson directed ATS's counsel to change the signatory and the party to the service agreement from "Com-Net Development LLC" to "Com-Net Professional Mobile Radio LLC." Adamson believes he was the person who made the name change from Com-Net Development to Com-Net Professional. (Transcribed Adamson testimony, attached to defendants' proposed findings of fact and conclusions of law as appendix A, at 9.) (D-63)

(10) Adamson contacted Savor shortly before March 24, 1999 and indicated that ATS was prepared to sign the service agreement. (Savor testimony.) (D-65)

(11) Savor was willing to do this as he believed it gave the LLC leverage to persuade ERI to complete the deal sooner.

(12) ATS did not ask any representative of Com-Net PMR LLC for financial statements or pro formas. It did not do any due diligence nor did it seek any form of guaranties of Com-Net PMR LLC's contractual obligation from any other entity or individual. (Adamson testimony.) (D-67)

(13) In 1998, representatives of Com-Net Professional Mobile Radio Inc. had approached Equitable Resources Inc. with a proposed alternative to ERI's current internal communications system. Instead of ERI operating its own system and leasing the 14 channels directly from ATS, on a month-to-month basis, the proposal envisioned an independent communications system, owned and maintained by an independent entity, of which ERI would be one customer. (Frobouck, Savor and Beatty testimony.) (D-18)

(14) ATS was aware of this larger deal that was being negotiated with ERI.

(15) At the time he signed the service agreement with Com-Net PMR LLC, Adamson was aware that Com-Net PMR LLC had not yet entered a contract with ERI and that negotiations with ERI were ongoing. (Adamson testimony.) (D-68)

(16) Because a necessary part of the proposed transaction with ERI would be the lease of the 14 channels from ATS, negotiations were also conducted with ATS

to secure the radio frequencies for the term of the proposed agreement with ERI. (Frobouck, Savor and Fasulo testimony; defense exhibit 126A.) (D-50)

(17) As of March 24, 1999, ERI had told ATS that ERI's "agreement with Com-Net was on track and they were proceeding and yes, we should be negotiating and working with Com-Net." (Transcribed testimony of Adamson at 2-3, attached as exhibit A to defendants' proposed findings of fact.) (D-69)

(18) Paragraph 10.1 of the service agreement is an integration clause which provides:

"10.1 This agreement (including any schedules hereto), and all other documents delivered pursuant to this agreement constitute the entire understanding between the parties relating to the subject matter of this agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings, representations, warranties and communications of any kind of or between the parties, whether oral or written, respecting such subject matter." (D-70) (P-25)

(19) Com-Net PMR LLC's obligation to perform under the service agreement was not contingent upon the sale of the ERI radio system closing. There is no contingency clause in the service agreement that releases Com-Net PMR LLC from its contract if the ERI transaction did not close. (P-25)

(20) PNC Bank was to provide the initial funding for the purchase of ERI's system with a bridge loan of $8.2 million. (Frobouck, Savor, Fasulo and Majeski testimony; defense exhibits 122 and 126A.) (D-22)

(21) With a signed lease from ERI as collateral, Com-Net PMR LLC planned to issue notes bearing in-

terest at 7.52 percent to secure its borrowing 10 to 15 million dollars from Provident Life and Accidental Insurance Co. (Frobouck, Savor and Fasulo testimony; defense exhibit 126A.) (D-23)

(22) PNC would have funded the bridge loan had ERI signed an agreement with Com-Net PMR LLC. (Majeski testimony.) (D-25)

(23) Com-Net Professional Mobile Radio Inc., as the member of Com-Net PMR LLC, was to guarantee the repayment of PNC Bank's bridge financing. (Fasulo testimony; defense exhibit 124.) (D-26)

(24) Provident made a binding commitment to Com-Net PMR LLC to buy collateralized notes in an amount between 10 and 15 million dollars, contingent on ERI agreeing to sell its system. Com-Net Professional Mobile Radio Inc. provided a guaranty for Provident's commitment to Com-Net PMR LLC. (Frobouck and Savor testimony; defense exhibit 29; plaintiff exhibit 28.) (D-28)

(25) A certificate of formation of Com-Net PMR LLC was filed with the Delaware secretary of state on December 28, 1998. (Defense exhibit 100.) (D-32)

(26) The purpose of Com-Net PMR LLC was to own, operate and maintain a communications system suitable for the use of utility customers, including ERI, and other customers. (Frobouck and Savor testimony.) (D-40)

(27) David J. Fasulo, as counsel for the member of Com-Net PMR LLC, filed an application for a federal employer identification number for the LLC. (Defense exhibit 110.) (D-33)

(28) Andrew Stidd of Global Securitization LLC was retained as an independent manager for Com-Net PMR

LLC. Stidd's duty to the bondholders would have been to ensure that all payments received from the system users were properly used to pay the bondholders and other accounts payable of Com-Net PMR LLC so that there could not be a default and so that the members or officers could not use any revenues for their own purposes. (Frobouck and Fasulo testimony; defense exhibit 45.) (D-34)

(29) Until the deal with ERI closed, Com-Net PMR LLC could not issue bonds or borrow significant sums of money.

(30) Because the ERI deal never went through, Stidd never did anything for the LLC other than sign the Certificate of Formation filed with the Delaware secretary of state. Stidd had no need to be involved with Com-Net PMR LLC, including its signing of the contract with ATS, until the ERI deal was concluded.

(31) Com-Net PMR LLC adhered to the appropriate formalities for a limited liability company, which are few. (Fasulo testimony; defense exhibit 100.) (D-42)

(32) Given the nature of limited liability companies generally and its start-up status, Com-Net PMR LLC shared office space, equipment and personnel with other Com-Net entities in the initial stages of its formation. (Frobouck and Savor testimony.) (D-43)

(33) Com-Net Professional Mobile Radio Inc. was a separate corporate entity and maintained its operations and corporate affairs separately from those of Com-Net PMR LLC. Com-Net Professional Mobile Radio Inc. did not derive any profit from Com-Net PMR LLC as the LLC never was able to close the deal crucial to its purpose and therefore itself made no profit and had no as-

sets other than the 14 radio channels it was leasing from ATS. (Frobouck and Savor testimony.) (D-47)

(34) W.E. Anderson Group Inc. is a separate corporate entity and has maintained its operations and corporate affairs separately from those of Com-Net PMR LLC. W.E. Anderson Group Inc. did not derive any profits from Com-Net PMR LLC, because the LLC was never able to close the deal crucial to its purpose and therefore itself made no profit and had no assets other than the 14 radio channels it was leasing from ATS. (Frobouck and Savor testimony.) (D-48)

(35) The individual defendants worked together in the same group of companies and other ventures, always through established corporate entities. They also had success elsewhere in the United States with businesses involving other communications systems and communications towers. (Frobouck and Savor testimony.) (D-15)

(36) On November 4, 1997, the Anderson Group of companies and Daniel Eldridge (not a party to this action) had formed Com-Net Development Group LLC to build, lease and sell communications towers for mobile radio and cellular communications. (Frobouck and Savor testimony; defense exhibit 94.) (D-17)

(37) Savor, Frobouck and Richard Serdynski met with Adamson and Freund, ATS's general manager, on November 24, 1998 at Quicksilver Golf Club to discuss leasing ATS radio frequencies. Savor, Frobouck and Serdynski gave ATS their business cards, which identified Com-Net Development Group LLC as the Com-Net entity they represented. (Plaintiff exhibits 26A, 26B, 26C.) Frobouck and Savor also gave Adamson and Freund business cards which identified them as execu-

tives in the "Anderson Group of companies." Frobouck's business card (plaintiff exhibit 26d) identified him as president, and Savor's business card (plaintiff exhibit 26e) identified him as "Vice president of corporate and legal affairs." Both Savor and Frobouck are attorneys. (P-9) (D-52)

(38) Savor and Frobouck told ATS's Adamson and Freund at the meeting that they were negotiating with ERI for the sale and leaseback of ERI's two-way radio system assets to Com-Net. ERI was ATS's most important existing customer. ATS's channels were an integral and critical part of the ERI radio system, and ERI was paying ATS $2,000 per month per channel for 12 channels on a month-to-month basis. Savor and Frobouck stated that ERI had told them to talk to ATS about leasing ATS's radio frequencies on a long-term lease. Savor and Frobouck needed a long-term lease for ATS's channels to develop the proposed radio system in Western Pennsylvania, which was to include ERI as a principal user. (P-10) (D-50) (D-52) (D-56)

(39) At the November 24, 1998 meeting, Savor and Frobouck told ATS that, in addition to contracting with ERI for the radio system, their business plan included putting other public and private entities, such as Allegheny County, Duquesne Light and People's Natural Gas, on their two-way radio system. Frobouck wanted to combine the 37 specialized mobile radio entities in Western Pennsylvania that were operating such systems. (P-11)

(40) Adamson and Savor negotiated the contract directly. Two days before the service agreement was signed, Savor asked Adamson to substitute Com-Net PMR LLC as the entity which would sign the contract with ATS.

Adamson agreed to make this change, and did so personally. (P-16) (D-16) (D-51) (D-58)

(41) Savor was the person "most knowledgeable" about Com-Net PMR LLC's affairs. Savor and Adamson signed the service agreement between ATS and Com-Net PMR LLC even though Com-Net PMR LLC never had any assets. (P-26)

(42) Com-Net PMR LLC was formed to hold all the assets involved in the proposed transaction between Com-Net PMR LLC and ERI. The LLC would have had assets, and $15 million of financing, once ERI signed the various agreements with Com-Net PMR LLC. However, those agreements (defense exhibits 123, 84, 124, 82, 81) were never signed. (P-26)

(43) Com-Net PMR LLC never had any financial statements, statements of assets, or bank accounts, and it never filed any tax returns, because Com-Net PMR LLC "never got that far." (P-27)

(44) Com-Net PMR LLC never had any employees. It never had any office space separate from Anderson Group. (P-28)

(45) Com-Net PMR LLC never reached the point where it needed to be capitalized. The crucial deal with ERI was never consummated, rendering the LLC's purpose impossible to achieve.

(46) Savor knew that Com-Net PMR LLC could not and would not pay ATS under the service agreement unless ERI signed the agreements with Com-Net PMR LLC and Provident loaned money to Com-Net PMR LLC. (P-24)

(47) Savor did not have to tell this elementary fact of LLC life to Adamson or Freund because, as sophisticated businessmen, they already knew this.

(48) The failure of ATS to get guarantors for the contract at issue was not induced in any way by any or all defendants.

(49) As of March 24, 1999, Savor, Frobouck, Adamson and Freund all knew that no third parties such as Duquesne Light or Allegheny County, had yet made any firm commitments to use the proposed radio system.

(50) Com-Net PMR LLC itself never made any payments under the service agreement. The six payments made to ATS under the service agreement were made through the Anderson Group. The checks (plaintiff exhibit 50A-50F) were drawn on Anderson Group's checking account, including the check given to ATS at the signing of the service agreement on March 24, 1999 in Anderson Group's offices at 2501 CNG Tower in Pittsburgh. (P-30) (D-72)

(51) Com-Net PMR LLC never repaid Anderson or Anderson Group any of the money which Anderson Group had paid to cover the initial expenses of Com-Net PMR LLC. (P-31)

(52) The amounts of payment to ATS from W.E. Anderson Group Inc. were informal advances or "good Samaritan" loans to Com-Net PMR LLC, the repayment of which was reasonably expected by all parties, including ATS, to be done at the closing of the ERI deal. (Frobouck and Savor testimony.) (D-73)

(53) The draft Com-Net PMR LLC operating agreement (plaintiff exhibit 72, p. 2) provided that Com-Net PMR LLC was to file for authorization to do business in Pennsylvania. (P-36)

(54) That authorization was never requested because the ERI deal failed, and Com-Net PMR LLC did no busi-

ness in Pennsylvania. (Agreeing to pay for the radio leases is *not* "doing business in Pennsylvania," nor is making a few early payments on account of a 15-year contractual obligation.)

(55) As of December 10, 1998, the secretary of state of the Commonwealth of Pennsylvania certified that Com-Net Professional Mobile Radio Inc. was a corporation in good standing. (Defense exhibit 106.) (D-9)

(56) Al Beatty was the director of ERI's communications department from the time that Com-Net Professional Mobile Radio Inc. made its proposal to ERI, until December 31, 1998. (Beatty testimony.) (D-74)

(57) ERI experienced a change in upper management in January 1999. (Beatty testimony.) (D-75)

(58) ERI did not intend to continue its arrangement with ATS and instead planned to outsource its communications department sometime in 1999. (Beatty testimony.) (D-55)

(59) One of the possible "outsources" ERI was considering was Com-Net PMR LLC.

(60) Beatty remained at ERI as a consultant with ERI and had personal knowledge of the progress of the proposed deal with ERI until April 16, 1999. (Beatty testimony). (D-76)

(61) Beatty testified that, up to the time of his departure on April 16, 1999, ERI's new management had not yet made a decision to halt or terminate the deal with Com-Net PMR LLC and that the deal was on-going and under consideration when he left. (Beatty testimony.) (D-77)

(62) As of March 24, 1999, the date on which ATS signed the service agreement at issue, negotiations be-

tween ERI and Com-Net PMR LLC were still going on. (Frobouck, Savor and Beatty testimony.) (D-78)

(63) After the signing of the service agreement and while negotiations between Com-Net PMR LLC and ERI were proceeding, ERI leased the 14 channels from Com-Net PMR LLC on a month-to-month basis. (Savor testimony; defense exhibit 41.) (D-83)

(64) By early August 1999, the new ERI management had opted to use another communications system and the proposed sale and leaseback of its systems to Com-Net PMR LLC was finally dead. (Frobouck and Savor testimony; defense exhibit 44.) (D-84)

(65) When no commitments from Duquesne Light or Allegheny County were forthcoming, Com-Net PMR LLC, in October 1999, informed ATS that it would be making no further payments under the service agreement. (Savor testimony.) (D-86)

(66) Com-Net PMR LLC returned the channels to ATS, which eventually sold them to Nextel, thereby mitigating the contract damages.

The court declines to accept plaintiff's proposed findings nos. 56-63 regarding the Anderson Group as it does not find that the LLC form was misused in any way. As to plaintiff's proposed findings nos. 40-55, regarding Com-Net Professional Mobile Radio Inc., the court declines to accept those for the same reason.

## DISCUSSION

Basically, there is very little dispute over the material facts, although the spin that ATS gives to them is vastly different from the view taken by defendants or the court. The above findings of fact reveal the following scenario:

ATS had a month-to-month contract with ERI, whose ventures include a local gas company, for the lease of 14 of ATS's radio channels to ERI for $2,000 per channel per month. Savor and Frobouck approached ATS about the possibility of acquiring the ERI channels from ATS on a long-term basis. They were hoping to form a county-wide system of radio communication that would be used by various public and quasi-public entities that hereto-fore had each owned and maintained their own systems. The systems consisted of radio towers and ancillary equipment in addition to radio channels themselves. Criti-cal to Savor and Frobouck's plans was the acquisition of ERI's entire system, which it would then lease back to ERI and would also lease to the other potential users (such as Allegheny County and Duquesne Light Com-pany). They had been working on this for several months and approached ATS with the approval of ERI about leas-ing their 14 channels.

Savor and Frobouck, who also identified themselves at the time, correctly, as executives of the Anderson Group of companies, met with ATS executives Adamson and Freund at the Quicksilver Golf Club on November 24, 1998, to discuss leasing the channels ATS was then leas-ing to ERI on a month-to-month basis. As originally con-templated, the deal with ATS would close simultaneously with the purchase and lease-back of ERI's system. The expected owner of the new countywide system was to be an LLC, originally designated as "Com-Net Devel-opment Group LLC," in the draft agreements that ATS had its Washington DC attorney prepare. In other words, the instant contract was originally expected to be signed at the same time as ERI sold its system to the same LLC

whose purpose would be owning the new countywide radio communications system. It should be noted that this larger deal, countywide (or, possibly, region-wide) communications, was not pie-in-the-sky. It was an excellent idea, but it needed the extensive ERI-owned system just as much as, or even more than, it needed the 14 channels ATS controlled.

The only part of the larger deal that was easily negotiated was that represented by the instant contract between ATS and Com-Net PMR LLC. Another relatively easy part of the deal was the financing: PNC Capital Markets and Provident Life and Accident Insurance Company had tentatively agreed to provide bridge financing and permanent financing, respectively, again to be finalized if the ERI deal could be made. See defense exhibit 122, proposal letter dated December 17, 1998, which inter alia, bound "Com-Net Professional Mobile Radio Inc. and/or a special purpose entity to pay all fees and expenses of legal counsel incurred by PNC Capital Markets" for due diligence and so forth regarding the bridge loan the LLC would need to close any deal with ERI.

However, probably because it had just changed its top executives, ERI was unwilling to consummate the deal Savor and Frobouck had been negotiating with Al Beatty, ERI's director of communications. Beatty preferred to wait until new management had a chance to review and approve the purchase and lease-back of ERI's communications system. As a result, this part of the larger deal was not agreed to by the end of 1998 as was originally hoped, but instead negotiations continued into 1999, finally terminating unsuccessfully by early August of 1999. The credible (and virtually undisputed) evidence does

not support the contention of ATS that the deal was dead on March 24, 1999, the day the instant contract was signed, and that all the defendants knew this at the time.

Once the deal with ERI was clearly beyond resuscitation, Com-Net PMR LLC returned the channels to ATS, which eventually was able to sell them to Nextel. The evidence of the sale price to Nextel was relevant to ATS's undisputed duty to mitigate and was available to the jury which decided the amount of contract damages Com-Net PMR LLC was liable for. It should go without saying that, aside from those radio channels, Com-Net PMR LLC had no other assets, as it was never able to close the deal with ERI and therefore was unable to pursue the countywide communications system that was to have been the LLC's ultimate purpose and the source of income to pay off not only the anticipated loans from PNC and Provident but also the contract with ATS.

Regarding ATS's reliance on *Trustees of National Elevator Industry v. Lutyk,* 140 F. Supp.2d 447 (E.D. Pa. 2001), the court finds it is misplaced. The facts of *Lutyk* span several years and show, inter alia, that the sole shareholder repaid to himself *supposed* loans at a time when the company was insolvent; that he used corporate funds to buy club memberships which were used for his personal entertainment and served no business purposes; that he attempted to deceive the court who clearly rejected his explanations for missing documents and so forth; that he admitted not having paid employee and employer contributions for several years to a trust fund (whose trustees were the plaintiffs) in admitted violation of federal law (specifically, ERISA). In short, the contrast between the facts of *Lutyk* and those of the instant case could not be more striking.

While the instant case was tried over several days and has a large amount of documentary evidence, the end result is rather simple. The facts are that ATS knew it was dealing with an LLC, knew an LLC's liability is very limited, and admits it knew that the LLC "would have had assets, and $15 million of financing, once ERI signed the various agreements with [Com-Net PMR LLC]." (See plaintiff's proposed findings of fact no. 26.) Yet when the ERI deal fell through, and ATS, after having received contract payments for six months,[2] was given back its consideration (the 14 radio channels), ATS tried to obtain more protection than it had bargained for. ATS had demanded no guaranties for the LLC's obligations yet now it asks the court, in effect, to provide guaranties after-the-fact. ATS claims, at least implicitly, to have lost the ability to keep on leasing its channels to ERI after that larger deal fell through, yet all ATS had with ERI before March 1999 was a month-to-month arrangement that Mr. Beatty, in his uncontradicted testimony, said was not going to continue in any case.

In other words, neither the contract itself nor any of the other evidence supports the position of ATS that the corporate entities, or any of them, were misused or necessary formalities ignored.

ATS, run by sophisticated businessmen who themselves pushed for the premature closing of their part of the larger ERI deal with Com-Net PMR LLC, now seeks special treatment from the court. ATS's case, albeit

---

2. The "good Samaritan" lease payments made by the Anderson Group while the ERI deal was pending are not a misuse of either Com-Net PMR LLC nor the Anderson Group. Rather, they represent an attempt to keep the LLC from defaulting on the service agreement with ATS until the ERI deal could be closed.

well-tried by its current counsel, is absolutely without merit. Its complaint is with the legislators who permitted LLCs to come into being, not with defendants who followed the law in good faith, reasonably believing that ATS knew that law as well, and who had no duty in any event to protect ATS from its own mistakes.

## CONCLUSION

There is no basis upon which any defendant other than Com-Net PMR LLC may be held liable to ATS. See decree nisi filed herewith.

## DECREE NISI

And now, to-wit, May 15, 2002, it is ordered and decreed that plaintiff's demand that liability for the breach of its contract with Com-Net Professional Mobile Radio LLC be imposed also on defendants W.E. Anderson Group Inc., Com-Net Critical Communications Inc., Steven Savor Jr., Stephen Frobouck, and William E. Anderson be and hereby is denied.

The prothonotary shall enter this decree nisi and give notice thereof to the parties or their counsel of record. If no post-verdict motions are filed within 10 days, in accordance with Pa.R.C.P. 227.1(c)(2), this decree nisi shall be entered by the prothonotary as the final decree, as of course.