QUAD/GRAPHICS, INC., a Wisconsin corporation, Plaintiff,

v.

Myron FASS; Readington Farms, Inc.; Countrywide Publications, Inc.; Stories, Layouts and Press, Inc.; Equine Enterprises, Inc.; Fass Publications, Inc.; General Newsstand Publishing Corp.; Great American Magazines, Inc.; Jock, Inc.; M. F. Enterprises, Inc.; Modern Sports, Inc.; National Newsstand Publishing Corp.; Newsstand Media Publishing Corp.; and U. S. Publishing, Inc., Defendants.

No. 80–C–120.

United States District Court, E. D. Wisconsin.

Sept. 9, 1982.

Robert K. Steuer, Weiss, Steuer, Berzowski, Brady & Donahue, Milwaukee, Wis., for plaintiff.

Diane Slomowitz and Bruce C. O'Neill, Fox, Carpenter, O'Neill & Shannon, Milwaukee, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

This action was tried to the court from Monday, May 24, 1982, until Thursday, May 27, 1982. In addition to the testimony and exhibits offered during the trial, a number of pretrial stipulations were presented to the court. The parties have also filed comprehensive post-trial briefs. This decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

The plaintiff, Quad/Graphics, Inc., is a Wisconsin corporation engaged in the business of printing magazines. All of the defendant corporations except Readington Farms, Inc. and U. S. Publishing, Inc. were formed either in New York or in New Jersey and, at the relevant time, were publishers of numerous magazines. The entity designated U. S. Publishers, Inc. was never actually formed as a corporation, although it purported to be a party to the contract at issue in this case. All these defendants except Readington Farms will be referred to as the publishing defendants, the corporate defendants, or a similar designation. The defendant Myron Fass is a citizen of New Jersey. He and his brother Irving Fass each holds 50% of the stock in all of the publishing defendants and various other corporations. The defendant Readington Farms, Inc. is a New Jersey corporation which is entirely or almost entirely owned by Myron Fass.

The corporate defendants entered into a contract with the plaintiff in August, 1978. The contract is dated September 15, 1978, and is in evidence as exhibit 1. Generally stated, this contract provided that the plaintiff would print, bind, and ship magazines for the defendant corporations during a period commencing on October 1, 1978, and ending in 1983. The plaintiff now seeks to recover $1,500,000.00 from all of the defendants for unpaid charges incurred by the publishing defendants. The corporate defendants counterclaim for more than six million dollars on the grounds of breach of contract, fraudulent misrepresentation, and economic duress.

### THE PLAINTIFF'S CLAIM

The plaintiff seeks recovery of $1,500,-000.00 from the defendants. This stipulated sum represents the amount due from unpaid printing, shipping, and other charges incurred by the corporate defendants. Quad/Graphics asks the court to pierce the corporate veil of the publishing corporations and to impose liability on Myron Fass individually, on Readington Farms, and on the publishing corporations themselves. Quad/Graphics argues that Myron and Irving Fass have completely disregarded the corporate form and individual identities of their publishing corporations throughout the relevant period of time. It is undisputed that the corporate defendants all operated out of a single New York address, although at various times a few of the corporate defendants operated out of Myron Fass' residence. They were separately incorporated, maintained separate bank accounts, used different business letterheads, and were listed individually in telephone directories.

There were extensive dealings among the various corporations, as well as between all the corporations and the Fass brothers; the evidence makes it appear quite unlikely that the corporate defendants actually operated as individual entities. The parties agree that between September 15, 1978, and February 1, 1980, large sums of money were regularly transferred from one publishing defendant to another. These transfers are detailed on schedules attached to the pretrial stipulation. There were no agreements between the corporations to repay each other for any of the transfers.

In the same vein, other corporate assets were frequently shuffled among the corporate defendants. The publishing corporations regularly used each other's magazine titles, employees, advertising space, and copyrighted material. Conversely, it was a common occurrence for any given Fass publisher to make payment of the printing or freight charges incurred by another Fass corporation.

Finally, there were numerous transfers of funds from the accounts of the defendant corporations to Readington Farms, Myron Fass, or Irving Fass. In addition, expenditures were made by the corporate defendants for the benefit of Myron Fass. Examples of such stipulated expenditures include furs for Myron Fass' wife, a diamond, and two imported automobiles.

The business records of the defendant corporations, to the extent such records exist, do not reflect any business reason for these transfers. The defendants have not

offered any supportable explanation as to the purpose of the transfers. Any business records maintained by the corporate defendants are so obscure that it is impossible to determine the financial status of the defendant corporations at any given time.

At trial, Myron Fass was unable to state a credible business purpose for the questionable transfers. I find his attempt to explain away the large sums transferred to himself as justifiable salary payments to be wholly inadequate in light of his reported salary in preceding years.

Myron Fass also claims that his purchase of two imported automobiles, a Mercedes and a BMW, from his corporations at prices far below the market value established by the plaintiff's expert can be explained. Solely through his own testimony and without any supporting documents, Mr. Fass attempts to establish that the cars were originally purchased by the corporate defendants to be used in road tests conducted by the Fasses to provide material for articles in their auto magazines. The road tests allegedly caused significant damage to both cars, necessitating costly repairs and reducing the market value of the cars. Myron Fass' testimony in this regard is not convincing.

■ In determining whether to pierce the corporate veil, the court must decide whether the corporation operated only as an alter ego of the individual controlling it. If it appears that a person is merely dealing with his own property through a corporation just as if he were dealing with it individually, and if "applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim," the court may choose to disregard the corporate entity if such disregard would prevent an inequitable result. *Milwaukee Toy Co. v. Industrial Commission of Wisconsin,* 203 Wis. 493, 495–96, 234 N.W. 748 (1931), quoted with approval in *Sprecher v. Weston's Bar,* 78 Wis.2d 26, 37–38, 253 N.W.2d 493 (1977).

■ The greater weight of evidence in this case persuades me that although the defendant publishing corporations are named as separate entities in their incorporation papers, they did not really exist and operate apart from Myron Fass and his brother. Because of the Fass' manner of conducting business through their corporations, one cannot distinguish the assets and liabilities of one publisher from those of any other. Likewise, one cannot separate the corporations' business transactions from various personal transactions of the Fass brothers.

It is apparent that Myron Fass and his brother operated the publishing corporations as a giant cash box with many drawers. Funds were added to or removed from any of the drawers as desired, without documentation to permit subsequent identification or reconstruction of the transactions. This certainly goes beyond sloppy bookkeeping; there were no lines separating what belonged to each corporation. I find that the corporate defendants did not conduct their business independently nor did they operate separately from their owners' personal wishes.

After such disregard of the corporate form and depletion of the corporations' assets by the Fasses, it would be inequitable to limit Quad/Graphics' recovery for unpaid invoices to the corporate assets. Quad/Graphics cannot be held to have understood that it was contracting with a group of publishing companies that in fact operated as one with the persons dominating them. The corporate veil should be pierced, and Myron Fass will be held personally liable for the debts of his publishing corporations. The total amount that the plaintiff can recover from any or all defendants shall not exceed $1,500,000.00. The corporate publishing defendants are liable to the plaintiff in the full amount of $1,500,000.00; pursuant to the joint pretrial report regarding the plaintiff's case, Myron Fass' individual liability is limited to one-half that amount, or $750,000.00.

■ The defendant Readington Farms, Inc. was not a party to the contract with

Quad/Graphics nor was it engaged in the publishing business all along. Nevertheless, I am persuaded by the entire record that Readington Farms was in fact used by Myron Fass in connection with his publishing business. As previously described, substantial payments were made by various publishers to Readington Farms without any documentation. Readington Farms subsequently assumed liability for many invoices due from the corporate defendants; approximately $68,000.00 of these invoices remain unpaid. I conclude that Readington Farms should be held liable to the plaintiff for these outstanding invoices, namely, $68,-000.00.

### THE DEFENDANTS' CLAIMS

The publishing defendants have counterclaimed against the plaintiff on three grounds. First, the defendants claim that Quad/Graphics fraudulently misrepresented its printing capacity and thus improperly induced them to enter into the contract. Second, the defendants assert that Quad/Graphics broke its contract by delaying or missing deliveries of some magazines that it had agreed to print and deliver. Third, the defendants claim that the plaintiff wrongfully subjected them to economic duress, compelling the defendants to execute a security agreement and an assignment of payments to the plaintiff in June, 1979.

The volume of evidence presented to support these claims is massive, and no attempt will be made here to discuss each bit of evidence. Suffice it to say that despite an overwhelming quantity of data, the facts supporting the defendants' case are few.

■ The defendants argue that the plaintiff misrepresented its printing capacity and fraudulently induced the defendants to enter into the September 15, 1978, contract. To prevail on this claim, the defendants must initially show that the plaintiff made a representation to the defendants that was false. *Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 26, 288 N.W.2d 95 (1980). The defendants have not succeeded in carrying their burden on this claim.

The defendants contend that Quad/Graphics falsely represented that it had the capacity to print thirty or forty magazines per month for the defendants. The greater weight of the evidence shows that the plaintiff contracted to produce between twenty and thirty magazines per month, and that the plaintiff did, in fact, produce this quantity. It is significant that the defendants were unable to demonstrate that the plaintiff, on any occasion, was not capable of producing the quantity of magazines ordered by the defendants. In light of this, any actual limits there may have been on the plaintiff's capacity are irrelevant. In any event, the defendants' arguments regarding the plaintiff's alleged inadequate staff and equipment are unconvincing and not at all supported by the evidence.

The breach of contract claim has been ardently pressed by the defendants, but I find it to be meritless. Under the contract, Quad/Graphics and the publishing corporations were to agree on production schedules, and the plaintiff was obligated to print, bind, and ship magazines in accordance with those schedules. The defendants had a corollary obligation to submit all necessary materials to Quad/Graphics in accordance with the schedule, thus enabling the plaintiff to keep to its timetable. Although a production schedule was not appended to the contract itself, the parties subsequently developed a schedule.

The evidence conclusively demonstrates that the defendants simply did not adhere to the production schedules agreed upon by the parties. Even when a schedule was amended to accommodate delays attributable to the defendants, they frequently missed the extended deadlines.

Section 11 of the contract specifically provided that the publishers' delays in submitting materials to the printer could cause delays in the deliveries. It appears that this is exactly what happened. The defendants have shown the court no instances where they have provided the plaintiff with all needed materials in compliance with a

particular deadline and the plaintiff did not then complete its work according to schedule. Accordingly, any delays by Quad/Graphics in shipping magazines for which preliminary materials were submitted late is excused by the terms of the contract.

■ The defendants take the surprising position that even when they missed production deadlines, the plaintiff was nevertheless obligated to meet its own deadlines. This purported obligation stems from two factors. First, it is argued that the industry-wide practice of printers is to push high volume, multiple title publishers to submit their materials on time. The defendants suggest that the plaintiff did not "hound" them enough, but this argument is without merit. The defendants exaggerate the evidence when they urge that it establishes the existence of an industry-wide practice such as they describe. Furthermore, the plaintiff's employees devoted an impressive amount of effort to communicating with the Fass publishers regarding approaching deadlines.

■ The defendants also claim that the plaintiff was aware, prior to entering the contract, that the defendants routinely missed their deadlines. Thus, they argue, the plaintiff can be said to have agreed to produce the magazines according to schedule despite the defendants' dilatory practices. This argument is far from persuasive. The parties to the contract agreed to perform under certain conditions. The defendants cannot be heard to complain about the plaintiff's performance when they have failed to perform all the conditions precedent.

■ The defendants attempt to establish through expert testimony that the sales figures for many of the magazines indicate that Quad/Graphics must necessarily have delivered the magazines behind schedule. They argue that if the magazines are delivered late to the wholesalers, the wholesalers may refuse to distribute them for retail sale, or the retailers may refuse to accept them. If the late magazines are never put on the stands for sale, those issues will show a zero sales figure. Many issues of the defendants' magazines showed zero sales, and there is some evidence to indicate that some retailers may have refused to accept certain Fass titles for sale. Based on the above sequence of facts, the defendants argue that the plaintiff must have delivered the magazines late.

It is not controverted that late delivery of magazines can result in reduced or zero sales of those issues, and it is not contested that a large number of the defendants' magazines apparently did not sell even one copy. The defendants' expert testified that he believed such a low level of sales could only mean that wholesalers were not distributing the magazines for retail sale. However, the expert could not state his belief to a reasonable certainty that the wholesalers were withholding those magazines because they were delivered late.

A demonstration that many magazines realized no sales, even when accompanied by an expert's opinion that those issues were withheld by the wholesalers, does not logically compel the conclusion that the magazines were delivered late. In this case, such evidence does not even create a sufficient basis for inferring that late delivery was the cause of the low sales figures. A perusal of several samples of the defendants' no-sale magazines convinced the expert that the wholesalers or retailers may have had serious misgivings about the quality of some of the Fass publications, totally unrelated to the time of delivery. Even the defendants' expert witness agreed that late delivery is not the only reason a wholesaler or retailer may refuse to promote a certain title for sale.

The defendants have presented no direct evidence to show that the wholesalers received the magazines printed by the plaintiff later than anticipated; I am unwilling to make the sizable jump from the fact that late delivery can result in zero sales to the inference that the defendants' magazines were delivered late.

■ Apart from their problem of proving that the plaintiff delivered the magazines

late, the defendants have also failed to surmount the obstacle created by section 11 of the contract. Even if the plaintiff did ship magazines late or miss shipments altogether, the defendants have not successfully contradicted the plaintiff's evidence that the late or missed shipments were excused under the contract. Thus, the defendants' breach of contract claim has not been established.

■ The final ground for relief asserted by the defendants, economic duress, is also without merit. It is argued that Quad/Graphics took advantage of the defendants in their weakened financial condition and in effect forced them to execute a security agreement and an assignment of advance payments from the distributors to Quad/Graphics. As explained above, Quad/Graphics did not act improperly in entering into or performing under the contract. The weakened financial condition of the publishing defendants was not caused by Quad/Graphics. Many transactions in which extraordinarily large amounts of corporate funds flowed to the Fasses took place in the months prior to the execution of the documents at issue. In light of this and the unpersuasive evidence of late deliveries, I am unable to adopt the defendants' argument that the plaintiff caused the defendants to be placed in a vulnerable position. Likewise, there is nothing to show that the plaintiff exploited the defendants' posture.

The controlling law on economic duress is found in *Wurtz v. Fleischman,* 97 Wis.2d 100, 293 N.W.2d 155 (1980). In that case, the state supreme court, at pages 109–110, (quoting from 13 Williston, Contracts § 1617 at p. 707) set forth the standard for proof of economic duress:

> " '1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and
>
> 'Such act or threat must be one which deprives the victim of his unfettered will.
>
> 'As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining a gain, there is not duress; it must be made solely for the purpose of protecting the victim's business or property interests. Finally, the party threatened must have no adequate legal remedy.' "

The defendants have failed to meet this standard.

Therefore, IT IS ORDERED that judgment be entered in favor of the plaintiff against Countrywide Publications, Inc., Stories, Layouts and Press, Inc., Equine Enterprises, Inc., Fass Publications, Inc., General Newsstand Publishing Corp., Great American Magazines, Inc., Jock, Inc., M. F. Enterprises, Inc., Modern Sports, Inc., National Newsstand Publishing Corp., Newsstand Media Publishing Corp., and U. S. Publishing, Inc. in the amount of $1,500,000.00.

IT IS ALSO ORDERED that judgment be entered in favor of the plaintiff against the defendant Myron Fass for one-half, or $750,000.00, of the total amount.

IT IS FURTHER ORDERED that judgment be entered in favor of the plaintiff against the defendant Readington Farms, Inc. for $68,000.00 of the total amount.

IT IS FURTHER ORDERED that the defendants' counterclaims against the plaintiff be and hereby are dismissed.