## MCI WorldCom Communications Inc. v. Atiyeh

C.P. of Lehigh County, no. 2004-C-1405.

*Gerald E. Burns,* for plaintiff.
*Nicholas R. Sabatine III,* for defendants Atiyeh, U.S. TalkCheap.com LLC and U.S. Direct Inc.

JOHNSON, *J.,* November 29, 2006—

## INTRODUCTION

Before the court for disposition is the plaintiff's complaint filed on May 28, 2004. A non-jury trial was held

on August 21-23, 2006. Plaintiff, MCI WorldCom Communications Inc. (MCI) filed suit against Dennis Atiyeh, U.S. TalkCheap.com LLC (USTC), U.S. Direct Inc. (USD), Irish Call Centers Limited and Jamaica Call Centers Limited (against both of whom MCI obtained a default judgment on April 25, 2005), English Sports Information Processors Ltd. and English Sports Betting Inc. (both of whom were never served with process in this lawsuit).

MCI seeks compensation for telecommunications services.

## FINDINGS OF FACT

(1) Atiyeh is an adult individual who resides at 5828 Park Valley Road, Schnecksville, PA.

(2) MCI, now known as Verizon Business, is a global telecommunications company that provided, among other things, local and long distance telephone service.

(3) USD was a telecommunications company with offices at 850 Third Street, Whitehall, PA and 730 Boulevard, Kenilworth, NJ.

(4) USD was owned and controlled by Dennis Atiyeh.

(5) USD engaged in the sale of prepaid telephone calling cards.

(6) On January 4, 2002, Atiyeh, in his capacity as president of USD, executed a credit application on a form provided by MCI in which he represented that USD's estimated monthly usage with MCI would be $10,000 and listed himself as president of USD. (Exhibit 46.)

(7) As part of the credit application process with MCI, USD submitted a balance sheet as of June 18, 2002.

(8) On July 10, 2002, MCI and USD entered into a telecommunications service agreement for the sale and purchase for certain telecommunications services (MCI/ USD agreement). Under the MCI/USD agreement, MCI agreed to provide switched telecommunications services to USD, and USD agreed to pay for those services according to the terms of the agreement. (Exhibit 1.)

(9) On July 19, 2002, USD filed for Chapter 11 bankruptcy protection. (Exhibits 52, 59.)

(10) Atiyeh directed that the July bankruptcy petition be filed on behalf of USD.

(11) USD began receiving services from MCI in August of 2002. By the end of August, it had exceeded its credit limit, and billed over $140,000. (Exhibit 53.)

(12) USD failed to make payments according to the terms of the USD contract.

(13) USD received weekly invoices of its account that were addressed to "Atiyeh President of U.S. Direct." (Exhibits 62, 63, 65-67, 69, 71, 72, 75, 78, 81, 83, 85, 90, 98.)

(14) MCI threatened to shut off service to USD due to USD's failure to cure its delinquencies. (Exhibits 86, 100, 129.)

(15) Atiyeh represented to MCI that USD intended to cure its delinquencies. (Exhibit 45.)

(16) MCI entered into several repayment plans with USD through Atiyeh, but USD failed to make payments pursuant to the terms of those plans. (Exhibits 53, 73, 74, 89, 93, 102.)

(17) USD's July 2002 bankruptcy was dismissed on September 24, 2002. (Exhibit 126.)

(18) On October 4, 2002, MCI sent a demand disconnection notice to Atiyeh and USD. (Exhibit 124.)

(19) On October 11, 2002, USD again filed for Chapter 11 bankruptcy protection. (Exhibits 64, 127.)

(20) Atiyeh directed the filing of USD's October 2002 bankruptcy petition.

(21) USD's October 2002 bankruptcy was dismissed on November 26, 2002. (Exhibits 79, 127.)

(22) After USD's October 2002 bankruptcy was dismissed, MCI terminated USD's service. (Exhibit 100.)

(23) In an attempt to collect the monies owed by USD, MCI filed an action in the District Court of Tulsa County, Oklahoma. (Exhibit 112.) (Oklahoma action.)

(24) In the Oklahoma action, judgment was entered in favor of MCI and against USD in the amount of $1,732,401.87, plus allowable interest and costs (USD judgment). (Exhibit 112.)

(25) The USD judgment was transferred to the Court of Common Pleas of Lehigh County, Pennsylvania and was indexed at docket no. 2003-N-0959. (Exhibit 112.)

(26) No payments have been made, nor have any assets been recovered, to satisfy the USD judgment.

(27) The defendants did not produce any corporate records for USD, nor did they satisfactorily explain the absence of corporate records for USD.

(28) Atiyeh is listed as USD's sole (100 percent) shareholder in USD's first bankruptcy petition and is listed as USD's sole director, president and shareholder in USD's second bankruptcy petition. (Exhibits 64 at USD00047 and 00060; 128.)

(29) An October 25, 2002 letter from Atiyeh to Joshua Fondren identifies Atiyeh as CEO of USD. (Exhibit 68.)

(30) A November 7, 2002 letter from MCI to Atiyeh regarding USD's payment obligations is addressed to Atiyeh as president of USD. (Exhibit 73.)

(31) MCI's weekly billing account reports were addressed to Atiyeh as president of USD. (Exhibits 62 at USD00178; 65 at USD00173; 67 at USD00161; 69 at USD00154; 71, 72 at USD00139; 75, 78 at USD00125; 81 at USD00118; 83 at USD00110; 85, 90, 98.)

(32) Atiyeh identified himself as president of USD in a letter he sent by email to Josh Fondren of MCI. (Exhibit 45.)

(33) Atiyeh hired the employees of USD.

(34) Atiyeh directed the employees of USD in their work.

(35) Atiyeh determined which bills to pay on USD's behalf.

(36) Atiyeh also owned and controlled several companies including the following: U.S. TalkCheap.com LLC (USTC), Fisheries of the Future, Telephone USA, and English Sports Information Processors (ESIP).

(37) USD was merely a facade for the operations of Atiyeh.

(38) USD failed to keep proper corporate records or to observe corporate formalities.

(39) Despite MCI's requests, neither Atiyeh nor USD produced any documents in discovery in this case. Specifically, neither USD nor Atiyeh produced any tax returns and/or documents regarding the corporate form or structure of Atiyeh's companies including minutes, resolutions, by-laws, articles of incorporation, registrations to do business and/or stock transfer books, general ledgers, journals, financial statements, balance sheets, income statements, profit and loss statements and/or cash flow statements.

(40) Atiyeh was ordered by the court to produce tax returns, corporate formation documents and accounting documents in discovery, but he failed to do so.

(41) MCI requested that Atiyeh produce these tax returns, corporate formation documents and accounting documents at time of trial, but he failed to do so.

(42) No evidence of the existence of any tax returns, accounting records or corporate formation documents for USD, USTC or any other companies owned and controlled by Atiyeh were produced, nor was any explanation for their absence given.

(43) No tax returns, accounting records or corporate formation documents existed for USD.

(44) USD was never incorporated in any state.

(45) USD never held any corporate meetings nor issued any dividends.

(46) Atiyeh did not consistently use payrolls or issue W2s or 1099s for USD.

(47) Donald Scorese never audited USD's accounts and never prepared a financial statement for USD.

(48) USD filed no tax returns.

(49) The employees of USD were not paid at regular intervals.

(50) USD operated from the same address, had the same employees and had the same people in control as other companies owned and controlled by Atiyeh.

(51) USD employees and/or contractors did not have any sort of written employment agreement.

(52) USD and the other companies owned and controlled by Atiyeh operated interchangeably without regard for proper corporate form.

(53) Atiyeh caused USD assets to be commingled with assets of other companies owned and controlled by Atiyeh.

(54) During the years 2002 and 2003, the following bank accounts existed for companies owned and controlled by Atiyeh:

(a) USD had an account with Wachovia from 4/23/01-2/8/02. (Exhibit 13 at WAC0001, 32.)

(b) Atiyeh Publishing had an account with Wachovia from 12/12/00-2/8/02. (Exhibit 15 at WAC437, 473.)

(c) Telephone USA had an account with Wachovia from 1/1/02-1/15/03. (Exhibit 17 at WAC3304, 3363.)

(d) Fisheries of the Future had an account with Wachovia from 1/1/02-11/12/02. (Exhibit 20 at WAC3246, 3282.)

(e) USD had four accounts with PNC from 11/12/02-12/31/02. (Exhibits 21, 24, 26, 28.)

(f) US TalkCheap.com had an account with PNC from 11/12/02-3/31/03. (Exhibit 22.)

(g) Two USD accounts with Fleet from 2/21/02 to 10/31/02 and from 1/03 to 5/03. (Exhibits 34 and 36.)

(56) USD, Atiyeh and other companies owned and controlled by Atiyeh commingled funds, engaged in intercompany transfers and used the funds of one company to pay the debts of another.

(57) The following transactions are examples of the foregoing:

(a) A $15,000 US Treasury bail refund check made out to Atiyeh was deposited in USD's account. (Exhibit 14 at WAC1860.)

(b) Atiyeh directed that funds from an ESIP bank account in Jamaica be used to pay part of USD's debt to MCI. (Exhibits 49, 50, 54, 55.)

(c) USTC issued more than $15,000 in checks to USD, at Atiyeh's direction. (Exhibit 23 at PNC00297, 00323.)

(d) Checks made out to Telephone USA, USTC, Las Vegas Sports News and Cash were deposited into USD's

Fleet bank account. (Exhibit 37 at FLT0026, 28, 30, 43-45, 73-76.)

(e) Checks made out to Telephone USA were deposited in USD's Wachovia account. (Exhibit 14 at WAC1405-1407, 1854-1856, 1864-1865.)

(f) Checks from USD were made out to Cash (signed by Atiyeh) and Atiyeh. (Exhibit 14 at WAC2050, 2055-2056, 2064.)

(g) A wire transfer from USD was sent to an account at Toronto Dominion Bank with the beneficiary listed as English Sports Services (ESS) and the originator listed as Atiyeh. (Exhibit 14 at WAC2233.)

(h) Money orders addressed to USD were deposited in Telephone USA's account. (Exhibit 18 at WAC0921-922, 936.)

(i) Checks made out to USD were deposited in Telephone USA's account and Fisheries of the Future's account. (Exhibits 18 at WAC0730-733, 796, 871-872, 892-894, 924-926, 931, 975-982, 987-988, 995, 998-1003, 1033, 1047-1049, 1059, 1061; 19 at WAC2487, 3018-3020.)

(j) Checks from Atiyeh Publishing were made out to USD, ESS and Fisheries of the Future. (Exhibits 16 at WAC1313, WAC1358, WAC1361-1362, 1385-1386; 111.)

(k) Checks from ESS were made out to Fisheries of the Future and Telephone USA. (Exhibit 31 at PNC00703, 707, 717, 723; exhibit 33 at PNC895, 903, 1035, 1037, 1039, 1041, 1043, 1045, 1047, 1049, 1051, 1053, 1055, 1057.)

(l) Checks from Telephone USA were made out to Fisheries of the Future and were deposited in Telephone

USA's account and Fisheries of the Future's account. (Exhibits 18 at WAC3235; 19 at WAC3243.)

(m) A check to ESIP was deposited in Fisheries of the Future's account. (Exhibit 19 at WAC3086.)

(n) Checks from Atiyeh Publishing were made out to Cash and to Telephone USA. (Exhibit 16 at WAC1398; exhibit 31 at PNC901.)

(o) A check to Atiyeh Publishing was deposited in USD's account. (Exhibit 14 at WAC1852-1853.)

(p) Checks to Dennis Atiyeh were deposited in Atiyeh Publishing's, and Fisheries of the Future's accounts. (Exhibit 16 at WAC1316; exhibit 19 at WAC2512, 2597, 2929.)

(q) A check to Telephone USA was deposited in Atiyeh Publishing's account. (Exhibit 16 at WAC1336.)

(r) A check to Atiyeh was made out by Telephone USA. (Exhibit 33 at PNC1225.)

(s) Checks from Atiyeh were made out to Fisheries of the Future and Telephone USA. (Exhibit 31 at PNC699-702, 711, 721, 723-732; exhibit 33 at PNC897, 899, 905.)

(t) Checks to Cash were deposited in USD's account. (Exhibit 37 at FLT0026, 28, 30.)

(58) Atiyeh directed Super M&M, a customer of USD that purchased phone cards, to write checks to Telephone USA, Fisheries of the Future and Dennis Atiyeh for amounts owed to USD during the period of USD's bankruptcies (July 19, 2002 through September 24, 2002 and October 11, 2002 through November 26, 2002), as follows:

(a) 8/9/02 check for $15,000 (exhibit 19 at WAC2707);

424

(b) 8/12/02 check for $40,000 (exhibit 19 at WAC2814);

(c) 8/20/02 check for $20,000 (exhibit 19 at WAC2932); h. 9/17/02 check for $20,000 (exhibit 18 at WAC866); i. 9/23/02 check for $18,230 (exhibit 18 at WAC870); j. 10/22/02 check for $26,000 (exhibit 18 at WAC923); k. 10/16/02 check for $86,000 (exhibit 18 at WAC930); l. 10/27/02 check for $80,000 (exhibit 18 at WAC990).

(59) Atiyeh took money from USD to pay for the expenses of another company controlled by Atiyeh.

(60) There is no evidence or documentation to justify or document any loan between USD and any other company controlled by Atiyeh, nor to document or justify any intercompany transfer between and among the companies owned and controlled by Atiyeh.

(61) Atiyeh used funds of companies he owned and controlled to pay his personal expenses.

(62) USD was undercapitalized, and maintained insufficient funds in relation to the expenses it could reasonably expect to incur.

(63) USD maintained insubstantial funds in its bank accounts. (Exhibit 21 at PNC0026-29, 48-57.)

(64) USD had cash shortages and cash flow problems and Atiyeh did not keep cash in USD.

### CONCLUSIONS OF LAW AND FURTHER FINDINGS OF FACT

(1) In deciding whether alter ego liability exists, the concern is whether the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. *Village at Camelback Property Owners Association Inc.,* 371 Pa. Super. 452, 461, 538 A.2d 528, 533 (1988).

(2) A party seeking to pierce the corporate veil on an alter ego theory must establish that the controller ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a sham. *Garden State Tanning Inc. v. Mitchell Manufacturing Group Inc.,* 55 F. Supp.2d 337, 344-45 (E.D. Pa. 1999).

(3) It is the plaintiff's burden to establish by a preponderance of the evidence that alter ego liability exists. *Wheeling-Pittsburgh Steel Corp. v. Intersteel Inc.,* 758 F. Supp. 1054, 1058 (W.D. Pa. 1990).

(4) The factors to be considered in determining whether alter ego liability exists are: (1) whether corporate formalities have been observed and corporate records kept; (2) whether officers and directors other than the dominant shareholder himself actually function; and (3) whether the dominant shareholder used the assets of the corporation as his own. *Village of Camelback,* 371 Pa. Super. at 461, 538 A.2d at 533. The plaintiff is not required to prove fraud in order for the corporate existence to be disregarded. *Id.*

(5) Additional factors that can be considered are: (1) whether the corporation was undercapitalized; (2) whether the equity owners failed to adhere to corporate formalities; (3) whether the corporation and its equity owners substantially intermingled corporate and personal affairs; (4) non-payment of corporate dividends; (5) insolvency of the debtor corporation; (6) siphoning of corporate funds by the dominant shareholders; (7) non-functioning of the other officers or directors of the corporation; (8) lack or absence of corporate records; (9) intermingling of funds; (10) the fact that the subservient corporation is merely a facade for operations of a domi-

nant shareholder; and (11) whether the equity owners used the corporate form to perpetrate fraud or a fundamental unfairness exists. *Lumax Industries Inc. v. Aultman,* 543 Pa. 38, 42, 669 A.2d 893, 895 (1995); *American Bell Inc. v. Federation of Telephone Workers,* 736 F.2d 879, 886 (3d Cir. 1984); *Pearson v. Component Technology Corp.,* 80 F. Supp.2d 510, 523 (W.D. Pa. 1999).

(6) Overall, no single factor is determinative. *Connors v. Peles,* 724 F. Supp. 1538, 1558 (W.D. Pa. 1989).

(7) A balancing approach is to be employed, and the weight of all factors is important in determining what equity requires. *Id.; Village at Camelback,* 371 Pa. Super. at 461, 538 A.2d at 533.

(8) Assets of corporations owned by the same principal(s) are considered to be commingled when they are utilized without regard for the corporations' separate existences and only for the benefit of the principal(s). *Talens Landing Inc. v. M/V Ventures II,* 656 F.2d 1157, 1160-61 (5th Cir. 1981); *Quad/Graphics Inc. v. Fess,* 548 F. Supp. 966, 969 (D.C. Wis. 1982).

(9) Atiyeh was the sole, dominant and controlling shareholder of USD.

(10) The assets and funds of Atiyeh, USD, and the other companies owned and controlled by Atiyeh were all interrelated and commingled, thus, destroying their independent corporate identities.

(11) Atiyeh, USD and the other companies owned and controlled by Atiyeh engaged in intercompany transfers.

(12) Atiyeh had the ability to direct the transfer of funds between USD and other companies owned and controlled by Atiyeh.

(13) A corporation is considered to be undercapitalized when its capital is not proportionate to the obligations it undertakes. *Trustees of Nat. Elevator Industry Pension v. Lutyk,* 140 F. Supp.2d 447, 458 (E.D. Pa. 2001); *Connors,* 724 F. Supp. at 1561.

(14) USD was insolvent and undercapitalized because its capital was not proportionate to the obligations it undertook.

(15) Siphoning of funds occurs when a corporation's assets are diverted to satisfy obligations owed to shareholders, officers, and other corporate insiders instead of outside creditors. *Lutyk,* 140 F. Supp.2d at 458.

(16) This factor is especially relevant when the diversion of funds occurs at a time when the corporation's finances are "troubled." *Id.*

(17) USD's funds were siphoned by Atiyeh to satisfy Atiyeh's and the companies' obligations.

(18) Corporations are required to maintain certain formalities and records to bolster the fictional separateness between the corporation and its constituents. *Lutyk,* 140 F. Supp.2d at 460.

(19) Closely-held corporations are held to a relaxed standard, but they should at least maintain: tax returns, accounting books, insurance records, bank records, a registered office, articles of incorporation, by-laws, issuable stock certificates, regular director and shareholder meetings, and corporate meeting books. *Id.* at 460; *Connors,* 724 F. Supp. at 1564.

(20) USD and Atiyeh disregarded corporate formalities and kept no records.

(21) In order to justify piercing the corporate veil, there must be some degree of injustice or fundamental unfair-

ness in preserving the corporate veil. *Lutyk,* 140 F. Supp.2d at 460.

(22) An element of injustice exists in this matter because all the factors necessary to pierce USD's corporate veils have been shown.

(23) Atiyeh is the alter ego of USD, and is liable for all of its debts and judgments.

(24) This court takes judicial notice of the fact that, on November 26, 2003, a judgment was entered in this court at docket no. 2003-N-0959 in favor of MCI and against USD for USD's breach of the MCI/USD agreement in the amount of $1,732,401.87 plus interest at six percent. See *Krenzel v. SEPTA,* 840 A.2d 450, 454 at n.6 (Pa. Commw. 2003).

(25) Atiyeh is liable as alter ego of USD for the $1,732,401.87 USD judgment plus interest at the rate of six percent calculated from November 26, 2003, the date of entry of the USD judgment.

(26) To prove fraud, the plaintiff must prove, by clear and convincing evidence, that the defendant made a misrepresentation with knowledge of its falsity and with the intent of misleading the plaintiff to rely on it, that the plaintiff justifiably relied on such misrepresentation and that, the plaintiff was damaged as a proximate result. Pa. Standard Jury Instruction 13.14; *Shane v. Hoffman,* 227 Pa. Super. 176, 324 A.2d 532 (1974).

(27) Plaintiff's burden of proof as to fraud has not been met.

(28) Plaintiff's burden of proof as to negligent misrepresentation has not been met.

(29) Plaintiff's burden of proof as to conversion has not been met.

(30) The doctrine of res judicata bars relitigation of the same cause of action between parties and their privities. *Dempsey v. Cessna Aircraft Co.,* 439 Pa. Super. 172, 653 A.2d 679 (1995). Res judicata bars not only relitigation of issues which were raised but also issues or arguments which might have been raised. *Mintz v. Carlton House Partners,* 407 Pa. Super. 464, 595 A.2d 1240 (1991).

(31) In order for res judicata to apply, four elements must be present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the actions; and (4) identity of the quality or capacity in the persons for or against whom the claim is made. *Stewart v. Tomis Development Co.,* 315 Pa. Super. 63, 461 A.2d 636 (1983).

(32) The first two elements are not in dispute in the instant action and Atiyeh has been found by this court to be the alter ego of USD, which was a party to the action which resulted in the USD judgment.

(33) "When a party has obtained judgment against a corporation, and sues individuals to enforce the judgment, the individuals are in privity with the judgment if they are in privity with the corporation." *Minnesota Mining & Manufacturing Co. v. Egly,* 1989 WL 55384 (E.D. Pa.) at *2; *Le Cabaret 481 Inc. v. Municipality of Kingston,* 2005 WL 114171 (M.D. Pa.) at 6.

(34) When a plaintiff obtains a judgment against a corporation, but is unable to collect because of the corporation's insolvency, that plaintiff may then sue an individual owner seeking recovery for the judgment and who will be liable for the judgment if he is found to be the alter ego of the corporation. *Dudley v. Smith,* 504 F.2d 979 (5th Cir. 1974).

(35) In determining whether res judicata will apply, the essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties actually had an opportunity to appear and assert their rights. *Callery v. Municipal Authority of Blythe Township,* 432 Pa. 307, 243 A.2d 385 (1968); *Stevenson v. Silverman,* 417 Pa. 187, 208 A.2d 786 (1965); *Dempsey v. Cessna Aircraft Company,* 439 Pa. Super. 172, 653 A.2d 679 (1995); *In re Private Road in Union Township,* 148 Pa. Commw. 522, 611 A.2d 1362 (1992); *Fiore v. Commonwealth, Department of Environmental Resources,* 96 Pa. Commw. 477, 508 A.2d 371 (1986).

(36) In the Oklahoma action, the ultimate and controlling issues involved in the instant case were decided. The subject matter of that action was the same breach of the same MCI/USD agreement by USD for the same period of time. In the Oklahoma action, both MCI and USD actually had an opportunity to appear and assert their rights, even though, ultimately, a default judgment was entered against USD. USTC was not named as a defendant in that action and so did not have that opportunity, but there has been insufficient evidence presented to sustain any claim by MCI against USTC. Atiyeh was not named as a defendant in that action, but since we have found that he is the alter ego of USD, he, like USD, had the opportunity to appear and assert his rights. Therefore, the doctrine of res judicata applies to all contract claims and quasi-contract claims in plaintiff's complaint.

## DISCUSSION

Pursuant to the findings set forth above, the court makes following dispositions of the six specific counts in plaintiff's complaint:

*Count I—Alter ego liability for judgment—MCI against Dennis Atiyeh, U.S. TalkCheap, ICC, JCC, ESIP and ESB*

As to Atiyeh, MCI has met its burden of proof of a preponderance of the evidence as to the claim set forth in Count I and, therefore, Count I is sustained as against Atiyeh as the alter ego of USD. As to the remaining defendants, MCI has failed to meet its burden of proof and Count I is, therefore, dismissed as to all defendants other than Atiyeh.

*Count II—Breach of contract—MCI against all defendants*

As to USD and Atiyeh as the alter ego of USD, the claim set forth in Count II is barred by the doctrine of res judicata and Count II is, therefore, dismissed as to USD and Atiyeh. As to the remaining defendants, the plaintiff has failed to meet its burden of proof and Count II is, therefore, dismissed as to all defendants other than Atiyeh.

*Count III—Quantum meruit—MCI against all defendants*

As to USD and Atiyeh as the alter ego of USD, the claim set forth in Count III is barred by the doctrine of res judicata and Count III is, therefore, dismissed as to USD and Atiyeh. As to the remaining defendants, the plaintiff has failed to meet its burden of proof and Count III is, therefore, dismissed as to all defendants other than Atiyeh.

*Count IV—Unjust enrichment—MCI against all defendants*

As to USD and Atiyeh as the alter ego of USD, the claim set forth in Count IV is barred by the doctrine of res judicata and Count IV is, therefore, dismissed as to

USD and Atiyeh. As to the remaining defendants, the plaintiff has failed to meet its burden of proof and Count IV is, therefore, dismissed as to all defendants other than Atiyeh.

*Count V—Fraud—MCI against all defendants*

MCI has not met its burden of proof of clear and convincing evidence as to the claim set forth in Count V. The evidence is not so clear, direct, weighty, and convincing that the court can reach a clear conviction, without hesitancy, of the truth of the precise facts in issue related to MCI's claim that the defendants acted fraudulently or made fraudulent misrepresentations to MCI. Therefore, Count V is dismissed.

*Count VI—Negligent misrepresentation—MCI against all defendants*

MCI has not met its burden of proof of a preponderance of the evidence as to the claim set forth in Count VI. The court is not persuaded that it is more probably accurate and true than not that any of the defendants made negligent misrepresentations to MCI. Therefore, Count VI is dismissed.

*Count VI—Conversion—MCI against all defendants (Note: This is the 7th count, but is mis-numbered in the complaint as the second VI.)*

MCI has not met its burden of proof of a preponderance of the evidence as to the claim set forth in Count VI. The court is not persuaded that it is more probably accurate and true than not that any of the defendants committed a conversion of MCI's rights in property, including, but not limited to, telecommunications facilities and airtime minutes. Therefore, Count VI (7th count) is dismissed.

## CONCLUSION

Based upon the foregoing, judgment is entered in favor of plaintiff MCI WorldCom Communications Inc. and against defendant Dennis Atiyeh in the amount of $1,732,401.87 plus interest at the rate of six percent, calculated from November 26, 2003, the date the USD judgment was transferred to the Court of Common Pleas of Lehigh County, Pennsylvania.

## ORDER

And now, November 29, 2006, after non-jury trial on plaintiff's complaint against defendants, Dennis Atiyeh, U.S. TalkCheap.com LLC and U.S. Direct Inc., and for the reasons set forth in the accompanying opinion; it is ordered that Count I is sustained against defendant Dennis Atiyeh, Counts II, III, IV, V, VI and VI (7th count) are dismissed, and judgment is entered in favor of plaintiff MCI WorldCom Communications Inc. and against defendant Dennis Atiyeh in the amount of $1,732,401.87 plus interest at the rate of 6 percent, calculated from November 26, 2003.